# DEPARTMENT OF THE INTERIOR ET AL. *v.* KLAMATH WATER USERS PROTECTIVE ASSOCIATION

No. 99–1871.  Argued January 10, 2001—Decided March 5, 2001

1

4

*Malcolm L. Stewart* argued the cause for petitioners. With him on the briefs were *Solicitor General Waxman, Assistant Attorney General Ogden, Deputy Solicitor General Kneedler, Leonard Schaitman, Matthew M. Collette, John Leshy,* and *Scott Bergstrom.*

*Andrew M. Hitchings* argued the cause for respondent. With him on the brief were *Paul S. Simmons* and *Donald B. Ayer.**

JUSTICE SOUTER delivered the opinion of the Court.

Documents in issue here, passing between Indian Tribes and the Department of the Interior, addressed tribal interests subject to state and federal proceedings to determine water allocations. The question is whether the documents are exempt from the disclosure requirements of the Freedom of Information Act, as "intra-agency memorandums or

---

*Briefs of *amici curiae* urging reversal were filed for the Campo Band of Mission Indians et al. by *Susan M. Williams* and *Gwenellen P. Janov;* and for the Klamath Tribes et al. by *Tracy A. Labin, Carl Ullman, Curtis Berkey, Thomas P. Schlosser, Reid Peyton Chambers, Jill E. Grant, Dan Rey-Bear, Alice E. Walker, John B. Carter, Peter C. Chestnut, Rodney B. Lewis, Stephen V. Quesenberry,* and *Gregory M. Quinlan.*

*Lucy A. Dalglish, Gregg P. Leslie,* and *Bruce W. Sandford* filed a brief for the Reporters Committee for Freedom of the Press et al. as *amici curiae* urging affirmance.

Briefs of *amici curiae* were filed for the City of Tacoma, Washington, by *J. Richard Creatura;* and for United South and Eastern Tribes, Inc., by *William W. Taylor III, Michael R. Smith,* and *Eleanor H. Smith.*

letters" that would normally be privileged in civil discovery. 5 U. S. C. § 552(b)(5). We hold they are not.

## I

Two separate proceedings give rise to this case, the first a planning effort within the Department of the Interior's Bureau of Reclamation, and the second a state water rights adjudication in the Oregon courts. Within the Department of the Interior, the Bureau of Reclamation (Reclamation) administers the Klamath Irrigation Project (Klamath Project or Project), which uses water from the Klamath River Basin to irrigate territory in Klamath County, Oregon, and two northern California counties. In 1995, the Department began work to develop a long-term operations plan for the Project, to be known as the Klamath Project Operation Plan (Plan), which would provide for allocation of water among competing uses and competing water users. The Department asked the Klamath as well as the Hoopa Valley, Karuk, and Yurok Tribes (Basin Tribes) to consult with Reclamation on the matter, and a memorandum of understanding between the Department and the Tribes recognized that "[t]he United States Government has a unique legal relationship with Native American tribal governments," and called for "[a]ssessment, in consultation with the Tribes, of the impacts of the [Plan] on Tribal trust resources." App. 59, 61.

During roughly the same period, the Department's Bureau of Indian Affairs (Bureau) filed claims on behalf of the Klamath Tribe alone in an Oregon state-court adjudication intended to allocate water rights. Since the Bureau is responsible for administering land and water held in trust for Indian tribes, 25 U. S. C. § 1a; 25 CFR subch. H, pts. 150–181 (2000), it consulted with the Klamath Tribe, and the two exchanged written memorandums on the appropriate scope of the claims ultimately submitted by the United States for the benefit of the Klamath Tribe. The Bureau does not, how-

ever, act as counsel for the Tribe, which has its own lawyers and has independently submitted claims on its own behalf.[1]

Respondent, the Klamath Water Users Protective Association (Association), is a nonprofit association of water users in the Klamath River Basin, most of whom receive water from the Klamath Project, and whose interests are adverse to the tribal interests owing to scarcity of water. The Association filed a series of requests with the Bureau under the Freedom of Information Act (FOIA), 5 U. S. C. § 552, seeking access to communications between the Bureau and the Basin Tribes during the relevant time period. The Bureau turned over several documents but withheld others as exempt under the attorney work-product and deliberative process privileges. These privileges are said to be incorporated in FOIA Exemption 5, which exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." § 552(b)(5). The Association then sued the Bureau under FOIA to compel release of the documents.

By the time of the District Court ruling, seven documents remained in dispute, three of them addressing the Plan, three concerned with the Oregon adjudication, and the seventh relevant to both proceedings. See 189 F. 3d 1034, 1036 (CA9 1999), App. to Pet. for Cert. 41a–49a. Six of the documents were prepared by the Klamath Tribe or its representative and were submitted at the Government's behest to the Bureau or to the Department's Regional Solicitor; a Bureau official prepared the seventh document and gave it to lawyers for the Klamath and Yurok Tribes. See *ibid.*

---

[1] The Government is "not technically acting as [the Tribes'] attorney. That is, the Tribes have their own attorneys, but the United States acts as trustee." Tr. of Oral Arg. 5. "The United States has also filed claims on behalf of the Project and on behalf of other Federal interests" in the Oregon adjudication. *Id.*, at 6. The Hoopa Valley, Karuk, and Yurok Tribes are not parties to the adjudication. Brief for Respondent 7.

The District Court granted the Government's motion for summary judgment. It held that each document qualified as an inter-agency or intra-agency communication for purposes of Exemption 5, and that each was covered by the deliberative process privilege or the attorney work-product privilege, as having played a role in the Bureau's deliberations about the Plan or the Oregon adjudication. See 189 F. 3d, at 1036, App. to Pet. for Cert. 31a–32a, 56a–65a.

The Court of Appeals for the Ninth Circuit reversed. 189 F. 3d 1034 (1999). It recognized that some Circuits had adopted a "functional" approach to Exemption 5, under which a document generated outside the Government might still qualify as an "intra-agency" communication. See *id.*, at 1037–1038. The court saw no reason to go into that, however, for it ruled out any application of Exemption 5 on the ground that "the Tribes with whom the Department has a consulting relationship have a direct interest in the subject matter of the consultations." *Id.*, at 1038. The court said that "[t]o hold otherwise would extend Exemption 5 to shield what amount to ex parte communications in contested proceedings between the Tribes and the Department." *Ibid.* Judge Hawkins dissented, for he saw the documents as springing "from a relationship that remains consultative rather than adversarial, a relationship in which the Bureau and Department were seeking the expertise of the Tribes, rather than opposing them." *Id.*, at 1045. He saw the proper enquiry as going not to a document's source, but to the role it plays in agency decisionmaking. See *id.*, at 1039. We granted certiorari in view of the decision's significant impact on the relationship between Indian tribes and the Government, 530 U. S. 1304 (2000), and now affirm.

## II

Upon request, FOIA mandates disclosure of records held by a federal agency, see 5 U. S. C. § 552, unless the documents fall within enumerated exemptions, see § 552(b). "[T]hese

limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act," *Department of Air Force* v. *Rose,* 425 U. S. 352, 361 (1976); "[c]onsistent with the Act's goal of broad disclosure, these exemptions have been consistently given a narrow compass," *Department of Justice* v. *Tax Analysts,* 492 U. S. 136, 151 (1989); see also *FBI* v. *Abramson,* 456 U. S. 615, 630 (1982) ("FOIA exemptions are to be narrowly construed").

### A

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U. S. C. § 552(b)(5). To qualify, a document must thus satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it.

Our prior cases on Exemption 5 have addressed the second condition, incorporating civil discovery privileges. See, *e. g., United States* v. *Weber Aircraft Corp.,* 465 U. S. 792, 799–800 (1984); *NLRB* v. *Sears, Roebuck & Co.,* 421 U. S. 132, 148 (1975) ("Exemption 5 withholds from a member of the public documents which a private party could not discover in litigation with the agency"). So far as they might matter here, those privileges include the privilege for attorney work-product and what is sometimes called the "deliberative process" privilege. Work product protects "mental processes of the attorney," *United States* v. *Nobles,* 422 U. S. 225, 238 (1975), while deliberative process covers "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated," *Sears, Roebuck & Co.,* 421 U. S., at 150 (internal quotation marks omitted). The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among them-

selves if each remark is a potential item of discovery and front page news, and its object is to enhance "the quality of agency decisions," *id.*, at 151, by protecting open and frank discussion among those who make them within the Government, see *EPA* v. *Mink,* 410 U. S. 73, 86–87 (1973); see also *Weber Aircraft Corp., supra,* at 802.

The point is not to protect Government secrecy pure and simple, however, and the first condition of Exemption 5 is no less important than the second; the communication must be "inter-agency or intra-agency." 5 U. S. C. § 552(b)(5). Statutory definitions underscore the apparent plainness of this text. With exceptions not relevant here, "agency" means "each authority of the Government of the United States," § 551(1), and "includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government . . . , or any independent regulatory agency," § 552(f).

Although neither the terms of the exemption nor the statutory definitions say anything about communications with outsiders, some Courts of Appeals have held that in some circumstances a document prepared outside the Government may nevertheless qualify as an "intra-agency" memorandum under Exemption 5. See, *e. g., Hoover* v. *Dept. of Interior,* 611 F. 2d 1132, 1137–1138 (CA5 1980); *Lead Industries Assn.* v. *OSHA,* 610 F. 2d 70, 83 (CA2 1979); *Soucie* v. *David,* 448 F. 2d 1067 (CADC 1971). In *Department of Justice* v. *Julian,* 486 U. S. 1 (1988), JUSTICE SCALIA, joined by JUSTICES O'CONNOR and White, explained that "the most natural meaning of the phrase 'intra-agency memorandum' is a memorandum that is addressed both to and from employees of a single agency," *id.,* at 18, n. 1 (dissenting opinion). But his opinion also acknowledged the more expansive reading by some Courts of Appeals:

> "It is textually possible and . . . in accord with the purpose of the provision, to regard as an intra-agency mem-

orandum one that has been received by an agency, to assist it in the performance of its own functions, from a person acting in a governmentally conferred capacity other than on behalf of another agency—*e. g.,* in a capacity as employee or consultant to the agency, or as employee or officer of another governmental unit (not an agency) that is authorized or required to provide advice to the agency." *Ibid.*[2]

Typically, courts taking the latter view have held that the exemption extends to communications between Government agencies and outside consultants hired by them. See, *e. g., Hoover, supra,* at 1138 ("In determining value, the government may deem it necessary to seek the objective opinion of outside experts rather than rely solely on the opinions of government appraisers"); *Lead Industries Assn., supra,* at 83 (applying Exemption 5 to cover draft reports "prepared by outside consultants who had testified on behalf of the agency rather than agency staff"); see also *Government Land Bank* v. *GSA,* 671 F. 2d 663, 665 (CA5 1982) ("Both parties agree that a property appraisal, performed under contract by an independent professional, is an 'intra-agency' document for purposes of the exemption"). In such cases, the records submitted by outside consultants played essentially the same part in an agency's process of deliberation as documents prepared by agency personnel might have done. To be sure, the consultants in these cases were independent contractors and were not assumed to be subject to the degree of control that agency employment could have entailed; nor do we read the cases as necessarily assuming that an outside consultant must be devoid of a definite point of view when the agency contracts for its services. But the fact

---

[2] The majority in *Julian* did not address the question whether the documents at issue were "inter-agency or intra-agency" records within the meaning of Exemption 5, because it concluded that the documents would be routinely discoverable in civil litigation and therefore would not be covered by Exemption 5 in any event. 486 U. S., at 11–14.

about the consultant that is constant in the typical cases is that the consultant does not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it. Its only obligations are to truth and its sense of what good judgment calls for, and in those respects the consultant functions just as an employee would be expected to do.

### B

The Department purports to rely on this consultant corollary to Exemption 5 in arguing for its application to the Tribe's communications to the Bureau in its capacity of fiduciary for the benefit of the Indian Tribes. The existence of a trust obligation is not, of course, in question, see *United States* v. *Cherokee Nation of Okla.*, 480 U. S. 700, 707 (1987); *United States* v. *Mitchell*, 463 U. S. 206, 225 (1983); *Seminole Nation* v. *United States*, 316 U. S. 286, 296–297 (1942). The fiduciary relationship has been described as "one of the primary cornerstones of Indian law," F. Cohen, Handbook of Federal Indian Law 221 (1982), and has been compared to one existing under a common law trust, with the United States as trustee, the Indian tribes or individuals as beneficiaries, and the property and natural resources managed by the United States as the trust corpus. See, *e. g., Mitchell, supra*, at 225. Nor is there any doubt about the plausibility of the Government's assertion that the candor of tribal communications with the Bureau would be eroded without the protections of the deliberative process privilege recognized under Exemption 5. The Department is surely right in saying that confidentiality in communications with tribes is conducive to a proper discharge of its trust obligation.

From the recognition of this interest in frank communication, which the deliberative process privilege might protect, the Department would have us infer a sufficient justification for applying Exemption 5 to communications with the Tribes, in the same fashion that Courts of Appeals have found sufficient reason to favor a consultant's advice that

way. But the Department's argument skips a necessary step, for it ignores the first condition of Exemption 5, that the communication be "intra-agency or inter-agency." The Department seems to be saying that "intra-agency" is a purely conclusory term, just a label to be placed on any document the Government would find it valuable to keep confidential.

There is, however, no textual justification for draining the first condition of independent vitality, and once the intra-agency condition is applied,[3] it rules out any application of Exemption 5 to tribal communications on analogy to consultants' reports (assuming, which we do not decide, that these reports may qualify as intra-agency under Exemption 5). As mentioned already, consultants whose communications have typically been held exempt have not been communicating with the Government in their own interest or on behalf of any person or group whose interests might be affected by the Government action addressed by the consultant. In that regard, consultants may be enough like the agency's own personnel to justify calling their communications "intra-agency." The Tribes, on the contrary, necessarily communicate with the Bureau with their own, albeit entirely legitimate, interests in mind. While this fact alone distinguishes tribal communications from the consultants' examples recognized by several Courts of Appeals, the distinction is even sharper, in that the Tribes are self-advocates at the expense of others seeking benefits inadequate to satisfy everyone.[4]

---

[3] Because we conclude that the documents do not meet this threshold condition, we need not reach step two of the Exemption 5 analysis and enquire whether the communications would normally be discoverable in civil litigation. See *United States* v. *Weber Aircraft Corp.*, 465 U. S. 792, 799 (1984).

[4] Courts of Appeals have recognized at least two instances of intra-agency consultants that arguably extend beyond what we have characterized as the typical examples. In *Public Citizen, Inc.* v. *Department of Justice*, 111 F. 3d 168 (CADC 1997), former Presidents were so treated in

As to those documents bearing on the Plan, the Tribes are obviously in competition with nontribal claimants, including those irrigators represented by the respondent. App. 66–71. The record shows that documents submitted by the Tribes included, among others, "a position paper that discusses water law legal theories" and "addresses issues related to water rights of the tribes," App. to Pet. for Cert. 42a–43a, a memorandum "contain[ing] views on policy the BIA could provide to other governmental agencies," "views concerning trust resources," *id.*, at 44a, and a letter "conveying the views of the Klamath Tribes concerning issues involved in the water rights adjudication," *id.*, at 47a. While these documents may not take the formally argumentative form of a brief, their function is quite apparently to support the tribal claims. The Tribes are thus urging a position necessarily adverse to the other claimants, the water being inadequate to satisfy the combined demand. As the Court of Appeals said, "[t]he Tribes' demands, if satisfied, would lead to reduced water allocations to members of the Association and have been protested by Association members who fear water shortages and economic injury in dry years." 189 F. 3d, at 1035.

The Department insists that the Klamath Tribe's consultant-like character is clearer in the circumstances of the Oregon adjudication, since the Department merely represents the interests of the Tribe before a state court that will

---

their communications with the National Archives and Records Administration, even though the Presidents had their own, independent interests, *id.*, at 171. And in *Ryan* v. *Department of Justice*, 617 F. 2d 781 (CADC 1980), Senators' responses to the Attorney General's questionnaires about the judicial nomination process were held exempt, even though we would expect a Senator to have strong personal views on the matter. We need not decide whether either instance should be recognized as intra-agency, even if communications with paid consultants are ultimately so treated. As explained above, the intra-agency condition excludes, at the least, communications to or from an interested party seeking a Government benefit at the expense of other applicants.

make any decision about the respective rights of the contenders. Brief for Petitioners 42–45; Reply Brief for Petitioners 4–6. But it is not that simple. Even if there were no rival interests at stake in the Oregon litigation, the Klamath Tribe would be pressing its own view of its own interest in its communications with the Bureau. Nor could that interest be ignored as being merged somehow in the fiduciary interest of the Government trustee; the Bureau in its fiduciary capacity would be obliged to adopt the stance it believed to be in the beneficiary's best interest, not necessarily the position espoused by the beneficiary itself. Cf. Restatement (Second) of Trusts § 176, Comment *a* (1957) ("[I]t is the duty of the trustee to exercise such care and skill to preserve the trust property as a man of ordinary prudence would exercise in dealing with his own property . . .").

But, again, the dispositive point is that the apparent object of the Tribe's communications is a decision by an agency of the Government to support a claim by the Tribe that is necessarily adverse to the interests of competitors. Since there is not enough water to satisfy everyone, the Government's position on behalf of the Tribe is potentially adverse to other users, and it might ask for more or less on behalf of the Tribe depending on how it evaluated the tribal claim compared with the claims of its rivals. The ultimately adversarial character of tribal submissions to the Bureau therefore seems the only fair inference, as confirmed by the Department's acknowledgment that its "obligation to represent the Klamath Tribe necessarily coexists with the duty to protect other federal interests, including in particular its interests with respect to the Klamath Project." Reply Brief for Petitioners 8; cf. *Nevada* v. *United States*, 463 U. S. 110, 142 (1983) ("[W]here Congress has imposed upon the United States, in addition to its duty to represent Indian tribes, a duty to obtain water rights for reclamation projects, and has even authorized the inclusion of reservation lands within a project, the analogy of a faithless private fiduciary cannot be

controlling for purposes of evaluating the authority of the United States to represent different interests"). The position of the Tribe as beneficiary is thus a far cry from the position of the paid consultant.

Quite apart from its attempt to draw a direct analogy between tribes and conventional consultants, the Department argues that compelled release of the documents would itself impair the Department's performance of a specific fiduciary obligation to protect the confidentiality of communications with tribes.[5] Because, the Department argues, traditional fiduciary standards forbid a trustee to disclose information acquired as a trustee when it should know that disclosure would be against the beneficiary's interests, excluding the Tribes' submissions to the Department from Exemption 5 would handicap the Department in doing what the law requires. Brief for Petitioners 36–37.[6] And in much the same vein, the Department presses the argument that "FOIA is intended to cast light on existing government practices; it should not be interpreted and applied so as to compel federal agencies to perform their assigned substantive functions in other than the normal manner." *Id.*, at 29.

All of this boils down to requesting that we read an "Indian trust" exemption into the statute, a reading that is out

---

[5] The Department points out that the Plan-related documents submitted by the Tribes were furnished to the Bureau rather than to Reclamation, a fact which the Department claims reinforces the conclusion that the documents were provided to the Department in its capacity as trustee. Brief for Petitioners 47. This fact does not alter our analysis, however, because we think that even communications made in support of the trust relationship fail to fit comfortably within the statutory text.

[6] We note that the Department cites the Restatement for the proposition that a "'trustee is under a duty to the beneficiary not to disclose to a third person information which he has acquired as trustee where he should know that the effect of such disclosure would be detrimental to the interest of the beneficiary.'" Brief for Petitioners 36 (quoting Restatement (Second) of Trusts § 170, Comment *s* (1957)). It is unnecessary for us to decide if the Department's duties with respect to its communications with Indian tribes fit this pattern.

of the question for reasons already explored. There is simply no support for the exemption in the statutory text, which we have elsewhere insisted be read strictly in order to serve FOIA's mandate of broad disclosure,[7] which was obviously expected and intended to affect Government operations. In FOIA, after all, a new conception of Government conduct was enacted into law, "'a general philosophy of full agency disclosure.'" *Department of Justice* v. *Tax Analysts*, 492 U. S., at 142 (quoting S. Rep. No. 813, 89th Cong., 1st Sess., 3 (1965)). "Congress believed that this philosophy, put into practice, would help 'ensure an informed citizenry, vital to the functioning of a democratic society.'" 492 U. S., at 142 (quoting *NLRB* v. *Robbins Tire & Rubber Co.*, 437 U. S. 214, 242 (1978)). Congress had to realize that not every secret under the old law would be secret under the new.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

---

[7] The Department does not attempt to argue that Congress specifically envisioned that Exemption 5 would cover communications pursuant to the Indian trust responsibility, or any other trust responsibility. Although as a general rule we are hesitant to construe statutes in light of legislative inaction, see *Bob Jones Univ.* v. *United States*, 461 U. S. 574, 600 (1983), we note that Congress has twice considered specific proposals to protect Indian trust information, see Indian Amendment to Freedom of Information Act: Hearings on S. 2652 before the Subcommittee on Indian Affairs of the Senate Committee on Interior and Insular Affairs, 94th Cong., 2d Sess. (1976); Indian Trust Information Protection Act of 1978, S. 2773, 95th Cong., 2d Sess. (1978). We do so because these proposals confirm the commonsense reading that we give Exemption 5 today, as well as to emphasize that nobody in the Federal Government should be surprised by this reading.