**RAYTHEON AIRCRAFT COMPANY,**
Plaintiff,

v.

**UNITED STATES ARMY CORPS OF ENGINEERS, Defendant.**

**Civ. A. No. 00–CV–1390.**

United States District Court,
D. Kansas.

Sept. 6, 2001.

James D. Griffin, Stephen J. Torline, Angel D. Mitchell, Blackwell Sanders Pep-

er Martin LLP, Kansas City, MO, for Plaintiff.

Emily B. Metzger, Office of United States Attorney, Wichita, KS, Yvonne C. Anderson, Topeka, KS, for Defendant.

### MEMORANDUM AND ORDER

BELOT, District Judge.

## I. INTRODUCTION

On September 22, 2000, Raytheon Aircraft Company (Raytheon) filed suit, pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. Section 552 *et seq.*, against the United States Army Corps of Engineers (the Corps). Doc. 1. Raytheon seeks the production of two identified reports as well as the underlying documents used to create the reports. Currently this matter is before the court upon the Corps' motion for summary judgment. Doc. 16.[1] Finding jurisdiction proper, 28 U.S.C. sections 1331 and 1346(a)(2), the court GRANTS in part and DENIES in part the Corps' motion.

### A. Issues Presented

Raytheon requested the Corps to produce two specifically identified reports as well as the documents underlying the reports. The Corps denied Raytheon's request, claiming the reports, as well as the underlying documents, were protected from production by the work-product doctrine, codified as "Exemption 5." *See* 5 U.S.C. § 552(b)(5). Raytheon filed suit under FOIA seeking production of the "records."

Though the case invokes federal statutory law, resolution of the Corps' motion turns upon the more-simply-stated-than-determined question of whether the two reports and/or the documents supporting the reports are protected by the work-product doctrine. The court determines that Exemption 5, despite FOIA's goal of liberal disclosure, prohibits production of the two reports. The underlying documents, however, are not protected by the work-product doctrine.

### B. Summary Judgment Standard: Fed. R. Civ. P. 56

Both parties appear well aware of the ordinary standards for summary judgment. Doc. 17, p. 4–5; Doc. 21, p. 9. As such, the court need not restate the familiar mantra. Instead, the following analysis is undertaken in a manner consistent with the standard enunciated in *Conoco v. J.M. Huber Corp.*, 148 F.Supp.2d 1157, 1164–66 (D.Kan.2001).

▮ In addition to the ordinary summary judgment standard, this court is

---

1. Also under consideration are the following: (1) the Corps' memorandum in support of its motion, (2) Raytheon's memorandum in opposition to the Corps' motion, (3) Raytheon's index of unpublished opinions, (4) Raytheon's index of evidentiary exhibits, (5) the Corps' reply to Raytheon's memorandum in opposition. Docs. 17, 21, 22, 23, and 27.

In addition to responding to the Corps' motion for summary judgment, Raytheon has filed a motion to strike the supplemental declaration of one of the Corps' affiants and a motion for leave to file a surreply. Docs. 31 and 35. In considering these motions, the court has reviewed (1) Raytheon's memorandum in support of its motion to strike, (2) the Corps' memorandum in opposition to Raytheon's motion to strike, (3) the Corps' response to Raytheon's motion for leave to file a surreply, and (4) Raytheon's reply to the Corps' response to Raytheon's motion for leave to file a surreply. Docs. 32, 33, 38, and 39. Raytheon's motion to strike is DENIED. Raytheon's motion for leave to file a surreply is GRANTED, but the surreply is neither relevant nor helpful.

On September 4, 2001, the Kansas Department of Health and Environment faxed a motion for leave to file an amicus curiae memorandum supporting Raytheon's position. Doc. 41. KDHE's motion comes far too late and is DENIED.

aware of the somewhat unusual context presented by FOIA claims. *See Thompson v. United States Dep't of Justice*, No. 96–1118–MLB, slip op. at 4 (D.Kan. July 15, 1998). Under FOIA, summary judgment may be properly granted if the agency offers adequate affidavit evidence indicating it has complied with its FOIA obligation. *See Barvick v. Cisneros*, 941 F.Supp. 1015, 1018 (D.Kan.1996). Agency affidavits are considered adequate and are therefore accorded substantial weight if the affidavit (1) describes the withheld information and the justification for withholding with reasonable specificity, demonstrating a logical nexus between the information and the exception the agency claims applies to the information,[2] and (2) is not contradicted by contrary evidence in the record or evidence of agency bad faith. *See Barvick*, 941 F.Supp. at 1018; *Badalamenti v. United States Dep't of State*, 899 F.Supp. 542, 546 (D.Kan.1995) (noting the agency affidavits are "accorded 'substantial weight' "). While the underlying factual allegations are given considerable weight, the Corps' decision not to release the requested information is accorded no deference due to the strong presumption FOIA places upon disclosure. *See Barvick*, 941 F.Supp. at 1019 (noting a *de novo* standard of review).

Furthermore, this court and others have noted that FOIA cases, unlike many employment discrimination or other similarly fact-intensive cases, are especially amenable to summary judgment because the law, rather than the facts, is the only matter in dispute. *See, e.g., Public Employees for Environmental Responsibility v. United States Environmental Protection Agency*, 978 F.Supp. 955, 959 (D.Colo.1997). Such is the case here. Thus, if the Corps establishes it withheld the requested reports and documents because they fell within the statutory exception, summary judgment is appropriate. *See id.* (citing *Carney v. United States Dep't of Justice*, 19 F.3d 807, 812 (2d Cir.1994)).

## C. Facts

### 1. General Information

In May of 1996, the Kansas Department of Health and Environment (KDHE) determined that the groundwater beneath the Herington Army Airfield (HAAF) was contaminated with trichloroethylene, a substance classified as hazardous under CERCLA, 42 U.S.C. section 9601 *et seq.* The United States Environmental Protection Agency (EPA) notified Raytheon and the City of Herington they were potentially responsible parties for this contamination. In order to respond to this allegation and defend against CERCLA liability, Raytheon sought information regarding HAAF.

To do this, Raytheon sent a letter to the Omaha District Counsel for the Corps on March 17, 2000 requesting certain records under the Freedom of Information Act (FOIA), 5 U.S.C. section 552. The letter requested "records identified as 'reports and all the underlying documents: one

---

**2.** Though the Corps' privilege log and affidavits are in less detail than would be expected, this court has various alternatives to ascertain this information. *See Public Employees for Environmental Responsibility v. United States Environmental Protection Agency*, 978 F.Supp. 955, 960 (D.Colo.1997) (discussing alternatives to determine whether the agency failed to disclose certain information). Accordingly, this court has conducted an *in camera* review

of the information at issue. Doc. 37; *see also Anderson v. Department of Health & Human Servs.*, 907 F.2d 936, 942 (10th Cir.1990) (discussing the *in camera* review); *Public Employees for Environmental Responsibility*, 978 F.Supp. at 960 (noting the court may engage in an *in camera* review of the withheld documents to determine what must be disclosed and what the agency has properly withheld).

titled something like "Historic Use of Chlorinated Solvents" and the other titled something like "Maintenance Operations at World War II Airfield".' plus the 'indices for all . . . of the reports.'" Doc. 17, ¶ 2. The Corps had in its possession two reports that were reasonably described in this request. The first report, titled "Historical Use and Development of Chlorinated Solvents," was written in 1996. The second report, "Solvents in Army Airfield Maintenance Operations—World War II," is dated 1998. The Corps denied Raytheon's request, claiming both the reports and their underlying documents were privileged under the work-product doctrine. Doc. 17, ¶ 4 (referring to Exemption 5 in 5 U.S.C. section 552(b)(5)). After the proper administrative steps were exhausted, Raytheon filed this suit seeking the 1996 and 1998 reports and the indices of the underlying documents.

### 2. United States Army Corps of Engineers

Before addressing the merits of this dispute, it is important to understand how the Corps became the defendant in this matter. The Corps has been designated by the United States Department of Defense and the United States Army "as the executive agent for the portion of the Defense Environmental Restoration Program (DERP) [,] known as the Formerly Used Defense Sites (FUDS) program authorized by law at 10 U.S.C. [section] 2701 et seq." Doc. 17, Ex. 2, p. 2.

A portion of the FUDS program involves sites with

> multiple responsible parties subject to Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. [section] 9601 et seq., as

amended (CERCLA). The sites are designated in the FUDS program as Potentially Responsible Party (PRP) sites, and are assigned to an USACE[3] attorney from the applicable District Counsel office as the lead representative for the agency. The agency mission for these projects is to determine if there is liability under CERCLA for [the Department of Defense], and, if so, to attempt to negotiate a settlement for a fair share of contribution to the response costs for the site, or to respond to litigation related to either liability or contribution under CERCLA.

Doc. 17, Ex. 2, p. 3.

If a property is determined to be a FUDS site, the Corps decides which of its underlying organizations is best equipped to handle the situation. For those sites involving hazardous, toxic or radioactive waste, the HTRW CX may be assigned.[4] HTRW CX is "an element of USACE where a group of experienced scientific, technical, legal, accounting and administration personnel provide assistance to the Headquarters, the Divisions and the Districts regarding environmental restoration and compliance projects throughout USACE." Doc. 27, Ex. 2., p. 3. Duties of legal counsel for HTRW CX include:

> providing expert assistance in environmental law, particular environmental liability, restoration and compliance legal issues, to the program and offices of USACE, including the local legal offices at the USACE Districts around the nation. This assistance may include advice and document drafting assistance, assistance in negotiations with regulators or private parties with claims against the agency, and assistance in litigation in-

---

3. USACE is the acronym for the Corps.

4. HTRW CX is an acronym, among many to follow, for the Hazardous, Toxic and Radioactive Waste Center for Expertise.

volving environmental issues. [It may also include providing] consistency reviews and recommendation to the Chief Counsel of USACE with regard to litigation involving environmental law, concerning the terms of consent decrees, the strategy in particular litigation cases, and the application of USACE legal and program policies in particular cases.

Doc. 17, Ex. 2, p. 1–2.

### 3. The Two Reports

The legal counsel for HTRW CX, Ann Wright, submitted an affidavit discussing many of the foregoing matters as well as her specific duties related to the creation of the two particular reports at issue here. Doc. 17, Ex. 2. Specifically, she states that she handles over 120 FUDS PRP cases, of which 60 involve litigation. In this litigation, HTRW CX assists the local Corps District's attorneys and/or Department of Justice lawyers representing the agency.

As part of the litigation support responsibility of USACE counsel for the FUDS PRP program, the District legal offices are required to assemble the necessary information for USACE counsel to analyze the potential for liability under CERCLA, and possible cost allocation settlement approaches in appropriate cases.[5] ... In all cases, this work is performed at the direction and for the use of the USACE attorneys in liability analysis and litigation. As part of this information gathering effort, records collection in other locations, such as the

National Archives and Records Administration (NARA), public libraries, military history offices, public aerial photo and map collections, etc., are researched and relevant records are extracted from the larger collections to assist counsel in their liability review. In many cases, a narrative report is prepared for counsel that summarizes and analyzes the collection of relevant records for information that is germane to liability and cost allocation under CERCLA.

Doc. 17, p. 4–5.

Due to the "historic similarities" related to the type of cases handled by HTRW CX, its counsel and staff proposed that certain recurring research topics for FUDS PRP cases be "thoroughly researched and made available for use by the Corps attorneys at the Districts in FUDS PRP cases, as well as the HTRW CX Counsel and the Chief Counsel's staff attorneys." Doc. 17, Ex. 2, p. 5. These reports were designed to provide consistent and thorough information to all attorneys working on FUDS PRP cases and to prevent the repeated expense of researching recurring issues. Doc. 17, Ex. 2, p. 5. The reports are in a narrative form that includes an indexed and sorted collection of records supporting the analysis. It appears that all of these records were obtained from public information repositories. Doc. 17, Ex. 2, p. 6.

The two reports were prepared "for the Counsel for the HTRW CX. Doc. 17, Ex. 2,

---

5. The information has been compiled for several cases including

claims related to the former Strother Field Site in Cowley County, Kansas, the subject of United States v. City of Arkansas City, Kansas, et al.; claims related to the former Coffeyville Army Air Field in Kansas, the subject of Hawks, et al. v. City of Coffeyville, et al.; claims related to the former Camp Ono in San Bernadino, California,

the subject of California v. United States; claims related to the former Herrington Army Air Field in Morris County, Kansas, not yet the subject of environmental liability claims in litigation, but the subject of demands from regulatory agencies and responsible parties including the Plaintiff in this case, Raytheon Aircraft Co.

Doc. 17, Ex. 2, p. 3–4.

p. 7. They are marked as privileged to USACE, are maintained in the office of the Counsel for the HTRW CX, and have been released only to USACE or other [Department of Defense] attorneys working on contested CERCLA liability cases."

### a. The 1996 Report

The 1996 "Historical Use" report was prepared "because a substantial number of the FUDS PRP cases [6] involve sites with groundwater contaminated with volatile organic chlorinated solvents, such as trichloroethylene (TCE), perchloroethylene (PCE), dichloroethylene (DCE), trichlorothane (TCA), and other compounds." Doc. 17, Ex. 2, p. 9. Information regarding the government's use of these solvents since the early 1900s "was considered to be necessary to the defense of the claims against the United States related to the responsibility for chlorinated solvent contamination at many FUDS PRP sites." *Id.* Research for the "Historical Use" report was conducted at public record facilities including the National Archives and Records Administration, the Library of Congress, the Air Force Museum, the Defense Technical Information Center and the United States Army Corps of Engineers Office of History. Doc. 17, Ex. 2, p. 9. The documents relevant to this report, all of which appear to be readily available to the public, were sorted and identified due to their relevance and materiality to the ongoing CERCLA liability claims related to the production, use, and disposal of these compounds. Doc. 17, Ex. 2, p. 9; Doc. 27, Ex. 2, ¶ 4.[7]

### b. The 1998 Report

The 1998 "Airfield Maintenance" report was prepared because numerous FUDS PRP sites were involved in World War II Army airfield activities. Doc. 17, Ex. 2, p. 10. The EPA and the KDHE alleged the Army airfields were contaminated. In addition, "[s]everal lawsuits or pre-litigation claims were filed against USACE based on claims of this nature." Doc. 17, Ex. 2, p. 10. "As a result of the lawsuits, USACE determined that it needed [to] gather[ ] and analyz[e] the evidence to support or refute these liability claims against the United States related to World War II era Army Airfield activities." *Id.* To this end, public records repositories, including the same sources utilized in the "Historical Use" report, were once again visited to review and collect information. Doc. 17, Ex. 2, p. 11. The documents relevant to this report, all of which appear to be readily available to the public, were sorted and obtained due to their relevance and materiality to the ongoing CERCLA liability claims related to maintenance activities at World War II-era Army airfields. Doc. 17, Ex. 2, p. 11; Doc. 27, Ex. 2, ¶ 5.

## II. ANALYSIS

### A. FOIA, Exemption 5, and the Work–Product Doctrine

#### 1. Legal Framework

#### a. FOIA

 Upon request, the Freedom of Information Act (FOIA), 5 U.S.C. section 552, mandates disclosure of records held by a federal agency unless the requested documents "fall within enumerated exceptions" contained in section 552(b). *Depart-*

---

6. The acronym "FUDS PRP" denotes a "formerly used defense site" where the government may be a "potentially responsible party."

7. Raytheon has filed a motion to strike Wright's supplemental declaration. Doc. 31. Based upon a consideration of both parties' positions, the court DENIES Raytheon's motion for the reasons stated in the Corps' response.

*ment of Interior v. Klamath Water Users Protective Ass'n,* 532 U.S. 1, 121 S.Ct. 1060, 1065, 149 L.Ed.2d 87 (2001). The exceptions are narrowly construed to give the utmost fidelity to the FOIA's basic premise of disclosure over secrecy. *See id.; Badalamenti v. United States Dep't of State,* 899 F.Supp. 542, 546 (D.Kan.1995) (citing *Department of Air Force v. Rose,* 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976)). Based upon Raytheon's request,[8] the Corps refused to provide information, relying upon Exemption 5. *See* 5 U.S.C. § 552(b)(5).

**b. Exemption 5**

Pursuant to section 552(b)(5), requests may be denied if the requested information consists of "inter-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5); *see also Federal Trade Comm'n v. Grolier Inc.,* 462 U.S. 19, 20, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983). For information to be covered by this exemption, a document must "satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Klamath Water,* 121 S.Ct. at 1065. Raytheon obviously does not dispute the first prerequisite is present. Therefore only the second condition is at issue. *Cf. Klamath Water,* 121 S.Ct. at 1068 & n. 3 (noting the two are independently vital conditions).

The second precondition to Exemption 5 has been described as protecting only those documents that would normally be privileged in the civil discovery context. *See Grolier,* 462 U.S. at 26, 103 S.Ct. 2209; *NLRB v. Sears, Roebuck & Co.,* 421 U.S.

132, 149 n. 16, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975) (stating that, unlike other contexts, there is no substantial need inquiry under Exemption 5). Though others privileges are certainly available under this Exemption, *see Sears, Roebuck & Co.,* 421 U.S. at 149, 95 S.Ct. 1504 (discussing the various civil discovery privileges), the Corps has asserted only the work-product privilege, thus rendering this case little more than a discovery dispute regarding the production of two reports and their supporting data.

**c. The Work–Product Doctrine**

 The work-product doctrine generally prevents the disclosure of the mental processes and thoughts of the attorney who is charged with planning and implementing a trial strategy. *See Hickman v. Taylor,* 329 U.S. 495, 511, 67 S.Ct. 385, 91 L.Ed. 451 (1947); *O'Shea v. Yellow Tech. Servs., Inc.,* No. Civ. A. 96–2370–GTV, 2000 WL 1456964, at *1 (D.Kan. Sept. 22, 2000) (stating that the primary purpose of the doctrine is to protect the mental impressions, opinions, and legal theories prepared by an attorney in anticipation of litigation); *see also Sears, Roebuck & Co.,* 421 U.S. at 154, 95 S.Ct. 1504 (noting that a Senate Report made clear that Exemption 5 would include the working papers of the agency attorney and documents that would come within the attorney-client and work-product privilege). This privilege is justified based upon the attorney's solemn duty to promote justice and protect the client's interest. *See Hickman,* 329 U.S. at 511, 67 S.Ct. 385; *In re Foster,* 188 F.3d 1259, 1272 (10th Cir.1999) (noting the privilege frees the lawyer to create materials without the fear of discovery and exploitation).

 In order to take advantage of the work-product doctrine, the Corps must es-

---

**8.** The Corps does not contest the validity of Raytheon's request.

tablish, via competent evidence, that the materials sought to be protected (1) are documents or tangible things, (2) were prepared in anticipation of litigation or for trial, and (3) were prepared by or for a party or a representative of that party. *See Johnson v. Gmeinder,* 191 F.R.D. 638, 643 (D.Kan.2000). Neither the first nor the third elements are challenged by Raytheon. Thus, this court need only determine whether the two reports were prepared in anticipation of litigation.

 The "in anticipation of litigation" element of the work-product doctrine focuses upon the motivating purpose behind creating the documents. *See Disidore v. Mail Contractors of America, Inc.,* 196 F.R.D. 410, 413 (D.Kan.2000) (quoting *Marten v. Yellow Freight Sys., Inc.,* No. 96–2013–GTV, 1998 WL 13244 (D.Kan. Jan. 6, 1998)); EDNA SELAN EPSTEIN, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK-PRODUCT DOCTRINE, 506 (4th ed.2001). The documents at issue must have been created based upon a request for legal advice, not just for a regular business purpose. *See Burton v. R.J. Reynolds Tobacco Co.,* 177 F.R.D. 491, 498 (D.Kan.1997). In fact, the Corps must establish that the threat of litigation was both real and imminent. *See McCoo v. Denny's Inc.,* 192 F.R.D. 675, 683 (D.Kan. 2000) ("The inchoate possibility, or even the likely chance of litigation, does not give rise to the privilege." (internal citations and quotations omitted)); 8 CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE, § 2024, p. 343 (1994 ed.) ("Prudent parties anticipate litigation and begin preparation prior to the time suit is formally commenced. Thus the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or ob-

tained because of the prospect of litigation.").

### 2. Application

At the outset it is important to note what is not particularly relevant to this court's inquiry. Ann Wright, counsel for the Corps, claims that the two reports were compilations of documents that were collected to "provide consistent and thorough information to all the Corps attorneys working similar FUDS PRP cases, and to avoid the repeated expense to the program of researching certain issues for two or more similar FUDS PRP cases." Doc. 17, Ex. 2, p. 5. The reports, she maintains, "were prepared to assist in actual or potential litigation involving the agency, or constitute collections of relevant evidence gathered to assist in representing the agency in litigation, and as such are considered privileged attorney work product that would not be routinely released in litigation with the agency." Doc. 17, Ex. 2, p. 8. Additionally, both reports have been marked as consisting of privileged and confidential information that is subject to the attorney work-product privilege. Doc. 17, Ex. 2, p. 7.

 While labeling the documents as "work product" and utilizing phrases commonly associated with documents protected by the doctrine may give facial credibility to the Corps' claim of privilege, these claims are unavailing and irrelevant conclusions. Simply placing language on a document that identifies it as "work-product" is of no help in determining whether the documents are truly protected by the doctrine. *See Ledgin v. Blue Cross & Blue Shield of Kansas City,* 166 F.R.D. 496, 499 (D.Kan.1996) ("The designations add nothing of consequence to determine whether the document indeed qualifies as work product within the meaning of federal law."). Similarly, the Tenth Circuit has

recently noted, in a separate though similar context, that utilizing "buzz" words to describe documents as protected is without legal significance. *See Poll v. United States Office of Special Counsel,* 2000 WL 14422, at *2, 208 F.3d 226 (10th Cir.1999) ("An affidavit which merely parrots the language of the statute and is drawn in conclusory terms is not sufficient ...."). With these superficial concerns discarded, the court can now face the crux of the issue—were the reports prepared "in anticipation of litigation."

 Notwithstanding these negative-sounding factors, the court concludes that the two reports were created in anticipation of specific litigation. To begin with, the reports were an intensive effort by the Corps to research, comprehend, and synthesize information crucial to litigating real and existing CERCLA claims. Doc. 17, Ex. 2, pp. 5, 8, 10; Doc. 27, Ex. 2, ¶¶ 4, 5. Moreover, the unrebutted evidence indicates the only impetus for the Corps to conduct such an exhaustive research project was the identified litigation where these issues had arisen. Thus, requiring disclosure of the reports would be contrary to both the letter and the spirit of the work-product doctrine.

Raytheon nevertheless claims that the reports should not be protected because the Corps is in the business of litigation and therefore did not collect the information for litigation-specific purposes but rather did so in its ordinary course of business. In support of this argument, Raytheon cites *Burton v. R.J. Reynolds Tobacco Co.,* 177 F.R.D. 491 (D.Kan.1997). In *Burton,* the court stated that "documents prepared in the ordinary course of that business [e.g., litigation] *without a tie to specific litigation* [are] not protected by work product immunity." *Burton,* 177

F.R.D. at 498 (emphasis added) ("The only evidence cited by RJR, however, indicates that the CTR was generally intended for litigation purposes and that there were a lot of lawsuits filed against RJR."). Unlike in *Burton,* attorney Wright presented unrebutted evidence that specifically identified the litigation that served as the genesis for the two reports. Doc. 17, Ex. 2, p. 3–4; Doc. 27, Ex. 2, ¶¶ 4, 5 (discussing the specific cases). Thus, even assuming the Corps, like the Council for Tobacco Research in *Burton,* is in the business of litigation, the Corps has sufficiently shown the reports were created in anticipation of specific and pending litigation.

As a corollary of its first argument, Raytheon, once again equating the Corps' directives to being in the business of litigation, claims the two reports were prepared for business purposes and are therefore not considered work-product. Doc. 21, p. 14–15 (citing *Ledgin v. Blue Cross & Blue Shield,* 166 F.R.D. 496 (D.Kan.1996)). Specifically, Raytheon claims that like in *Ledgin,* the two reports were generated only for business purposes, were not specifically directed at any specific case in litigation, and were only created to further the Corps' business interest of negotiating with other governmental agencies. Doc. 21, p. 16. For several reasons, including those already mentioned with respect to the discussion of *Burton,* the court finds Raytheon's argument unavailing.

While it may be true that the two reports were to be used in negotiations with governmental agencies,[9] the court has not found, nor has Raytheon provided, any authority to support a rule that would limit work-product protection based upon whether the case was settled through negotiations or whether the case was actually presented to a jury. *See Phillips v. Hillcrest Med. Ctr.,* 244 F.3d 790, 800 (10th

---

9. Negotiations, no doubt, discussing CERCLA liability and aimed at avoiding litigation.

Cir.2001) (noting the party pressing a point has an obligation to support the position with pertinent authority to show why such a position is legally or logically sound). Indeed, the wise litigator recognizes negotiation leading to settlement without litigation is a more cost-efficient litigation strategy for the client in nearly every litigation setting. Furthermore, *Ledgin* does not support Raytheon's position that the reports fail to satisfy the "in anticipation of litigation" element simply because the reports may have been useful in more than one case. The court's concern in *Ledgin* was not focused on the potential for multiple uses but rather that the uses were business-oriented and not related to pending litigation. *See Ledgin,* 166 F.R.D. at 498–99 (discussing the focus upon business considerations); *see also Frontier Ref., Inc. v. Gorman–Rupp Co., Inc.,* 136 F.3d 695, 703 (10th Cir.1998) (concluding the work-product doctrine "extends to subsequent litigation"). Unlike in *Ledgin,* the court finds, based upon its *in camera* review, that the two reports do not discuss potential business opportunities or objectives to be undertaken for business purposes. *See Ledgin,* 166 F.R.D. at 498–99. Rather, they set forth information traditionally considered within the realm of work-product protection. *See Hickman v. Taylor,* 329 U.S. 495, 511, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Thus, the court holds that *Ledgin* is of no assistance to Raytheon's claim that the two reports were not created in anticipation of litigation.

Raytheon also contends that even assuming the Corps created the reports in anticipation of litigation, the anticipation was unreasonable because the EPA did not name the Corps as a PRP in the Herington case until August 8, 2000, well after the reports were created. Doc. 21, p. 16. Thus, citing *Disidore v. Mail Contractors of America, Inc.,* 196 F.R.D. 410, 413 (D.Kan.2000), Raytheon claims the reports

were "premature" and therefore an unreasonable anticipation of litigation. Doc. 21, p. 16–17. As noted earlier, however, the two reports were generated to litigate earlier cases with specific similarities to the Herington case. This does not affect their continued classification as work-product. *See Federal Trade Comm'n v. Grolier, Inc.,* 462 U.S. 19, 26, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983) (concluding Exemption 5 protects work-product documents created in previous litigation); *Frontier Ref., Inc. v. Gorman–Rupp Co., Inc.,* 136 F.3d at 703.

### 3. Summary

Despite FOIA's general policy of favoring disclosure, the court finds, after conducting an *in camera* review, that the two reports fit within the narrowly construed Exemption 5. The documents were generated to promote effective litigation of several specific claims that faced the Corps. And, while the two reports were not created in anticipation of the litigation with which Raytheon is most concerned, this does not diminish the continued protection the work-product doctrine gives to the reports. Accordingly, the court grants the Corps' motion for summary judgment with respect to the two reports.

### B. Underlying Documents

Raytheon also claims that the documents underlying the two reports are discoverable. Doc. 21. In certain situations, the selection and compilation of documents may warrant work-product protection. *See In re Allen,* 106 F.3d 582, 608 (4th Cir.1997); *Sporck v. Peil,* 759 F.2d 312, 316 (3d Cir.1985). In other situations, however, such conduct does not warrant work-product protection. *See Audiotext Communications Network, Inc. v. U.S. Telecom, Inc.,* 164 F.R.D. 250 (D.Kan. 1996); *Bohannon v. Honda Mtr. Co. Ltd.,*

127 F.R.D. 536, 539 (D.Kan.1989) (stating this position was the "sounder rule"); *Henshaw v. Hennessy Indus., Inc.,* No. Civ. A. 91–2248–KHV, 1993 WL 818313, at *2 (D.Kan.1993). Neither party disputes that these apparently conflicting authorities exist, but argue about their proper application with respect to this case.

In support of their decisions to extend word-product protection to the underlying documents, the courts have primarily relied upon the argument that disclosure of these documents may reveal the thought process the Supreme Court in *Hickman* held to be inviolate. *See In re Allen,* 106 F.3d at 608. Chief among the reasons for rejecting this view is that often times the revelation of the underlying documents provides nothing insofar as the mental processes of the attorney is concerned. *See Bohannon,* 127 F.R.D. at 539 (citing *San Juan Dupont Plaza Hotel Fire Litig.,* 859 F.2d 1007, 1018 (1st Cir.1988)).

 Upon analyzing the two reports, the court concludes that the dissemination of a list of public documents the two reports were based upon will not reveal anything the work-product doctrine seeks to keep sacrosanct. The court finds that disclosing the documents underlying the two reports will not compromise Raytheon's protected mental impressions because the titles of the reports divulge more information than any arrangement of documents ever could. As discussed earlier, the titles of the reports are "Solvents in Army Airfield Maintenance Operations—World War II" and "Historical Use and Development of Chlorinated Solvents." Doc. 17, Ex. 2, p. 7. It should surprise no one then that the documents underlying the "Solvents In Army Airfield Maintenance Operations—World War II" detail the use of and procedures for airfield maintenance operations during the 1940s. Thus, unlike the reports, disclosing the list of documents con-

sulted in the compilation of the reports does not permit an unfair "peek" into the Corps' legal mind. *See Audiotext Communications,* 164 F.R.D. at 252 (rejecting an argument that the selection and grouping of documents is protected work-product). The Corps' motion for summary judgment as to the underlying reports is denied.

Finding the underlying documents are not protected by the work-product doctrine (and therefore Exemption 5), the court orders the Corps to provide to Raytheon a list of every document used in the creation of the two reports. For example, "Appendix A" to the 1996 Report and the "Referenced Document" section of the 1998 report would be acceptable. In the alternative, the court will permit the Corps to create, in its discretion, a similar list that is organized either alphabetically or chronologically by title, listing the document's title, date of creation, and the place where it can be found. Such disclosure shall be made within thirty days of the filing of this order.

### C. Remaining Issues

The court is aware of Raytheon's other objections to the Corps' failure to comply with the FOIA request, namely that the report may be segregable and/or that disclosure is necessary to determine whether the crime/fraud exception to the work-product doctrine applies. The court doubts whether there is an obligation segregate and produce the factual content of a work-product document. *See Federal Trade Comm'n v. Grolier Inc.,* 462 U.S. 19, 26, 103 S.Ct. 2209, 76 L.Ed.2d 387 (stating that the work-product of an agency's attorneys "would not be subject to discovery in subsequent litigation unless there was a showing of need and would thus fall within the scope of Exemption 5"); *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 149 n. 16, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975)

(accepting "as the law" that Exemption 5 protects from disclosure documents that may be disclosed in civil litigation based upon the litigant's need because such documents would not be routinely disclosed); *but see Fine v. United States Dep't of Energy,* 830 F.Supp. 570, 575 (D.N.M. 1993) (agreeing with decisions finding that factual material within work-product should be disclosed). With respect to the latter position, it also appears that such an exception would not apply in the FOIA context because it too would not be "normally" disclosed. In any event, disclosure of the underlying documents will address, though in a less concise manner, Raytheon's concerns. Accordingly, the court denies, to the extent raised, Raytheon's contention that the report should be segregated based upon the use of factual material or to discover the existence of a crime.

### III. CONCLUSION

In consideration of the competing interests attendant the confusing intersection between FOIA and the work-product doctrine, the court GRANTS the Corps' motion with respect to the two identified reports but DENIES the Corps' motion with respect to the underlying documents. The Corps shall make the appropriate disclosures within thirty days of the signing of this order.

A motion for reconsideration of this order is not encouraged. Any such motion shall not exceed three double-spaced pages and shall strictly comply with the standards enunciated by this court in *Comeau v. Rupp,* 810 F.Supp. 1172, 1174 (1992). The response to any motion for reconsideration shall not exceed three double-spaced pages. No reply shall be filed.

IT IS SO ORDERED.