**Derek L. WATERS, Plaintiff,**

v.

**UNITED STATES CAPITOL POLICE BOARD, Defendant.**

**Civil Action No. 01–920 (RMC/JMF).**

United States District Court, District of Columbia.

May 6, 2003.

James Harold Heller, Douglas Benjamin Huron, Heller, Huron, Chertkof, Lerner, Simon & Salzman, Washington, DC, for plaintiff.

Laurie J. Weinstein, U.S. Attorney's Office, Toby R. Hyman, Jean M. Manning, Brenda Pence, Robert L. Rogers, Office of Senate Chief Counsel for Employment, Washington, DC, for defendant.

## MEMORANDUM OPINION

FACCIOLA, United States Magistrate Judge.

This case was initially referred to me by Judge Leon for discovery disputes pursuant to LCvR 72.2(a), and has since been reassigned to Judge Collyer. Currently ripe for resolution are defendant's *Motion For Protective Order* and plaintiff's *Cross Motion To Compel Discovery.*

## BACKGROUND

Plaintiff, Derek Waters ("Waters"), was appointed a recruit officer in the United States Capitol Police ("USCP") on February 25, 2000. Complaint, ¶ 4. As a recruit officer, Waters was required to complete a ten week training period at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia. *Id.* During the training period, Waters overheard Adam Weiss ("Weiss"), Vice President of Recruit Class # 121, make racial comments while viewing a boxing match on television. *Id.* Following the boxing match incident, Waters and other recruit officers complained to Stanley Buchanan ("Buchanan"), the elected President of Recruit Class # 121, about Weiss' comments. Allegedly, no action was taken as a result of those complaints. Complaint, ¶ 5.

Upon returning to Washington, D.C., Recruit Class # 121 was required to take a written examination prior to becoming sworn non-probationary officers. On June 30, 2000, the examination was administered by the Training Division officer in charge, Officer Millham ("Millham"). The examination had to be completed in an hour and the examinees had to stay in the testing room for at least one half hour. When they finished the exam, they were supposed to leave the test booklet on the desk and exit the room with the answer sheet. *Id.,* ¶ 6; *Defendant's Opposition to Plaintiff's Motion to Compel Discovery* ("D.Opp.") at 3, Exhibit C. While standing in line, Waters changed one of his answers. Complaint, ¶ 6. Subsequently, Weiss and Buchanan accused Waters of cheating on the exam. *Id.,* ¶ 7.

An investigation of the alleged cheating was conducted by Sergeant Burton ("Burton") of the USCP Training Division. Lieutenant Reynolds, who supervised the investigation, presided over many of Burton's interviews of recruits who had personal knowledge of the events. Consideration of those interviews as well as Waters' admission that he had left the examination room with a pencil and changed one of his answers before turning in his answer sheet led Burton to conclude that Waters had engaged in conduct unbecoming an officer. D. Opp. at 3, Exhibit D (Burton's Investigative Report). Waters, however, denied the charge and on July 20, 2000, he was given a polygraph examination in order to determine whether he had an intent to cheat. Complaint, ¶ 9. The polygraph did not vindicate Waters of the cheating allegation and the Head of the Training Division, Inspector Larry Thompson ("Thompson"), an African–American, recommended that Waters be terminated from the training program. *Id.* As a result, Waters alleged

discriminatory conduct in connection with his termination. In turn, Thompson reported that allegation to Chief James Varey ("Varey"). *Id.,* ¶ 10. On July 26, 2000, Varey requested that the Internal Affairs Division ("IAD") conduct an investigation into Waters' allegations of racial discrimination. *Id.,* ¶ 11.

The IAD investigation was led by Sergeant Tonya Robinson ("Robinson"), an African–American female. Robinson produced a fifty-two page report based on 43 tape recorded interviews of witnesses, a review of Burton's investigation report, and Waters' polygraph. She concluded that her investigation "did not reveal a sufficient level of proof to substantiate that [Waters] was racially discriminated against by members of the Department," although it did reveal that some misconduct had occurred. *Id.,* ¶ 15. On January 3, 2001, Varey sent Waters a letter terminating his employment. *Id.,* ¶ 17.

## OVERVIEW

### The Dispute

The first dispute between the parties turns on plaintiff's insistence that the defendant identify by name and race the members of the defendant's work force and the employees terminated because of a polygraph examination or otherwise within a period of time before and after plaintiff's termination. He also seeks prior complaints of race discrimination against the defendant during that same period of time.

Defendant resists providing this information on the ground that the only discoverable information must relate to situations identical to his own, i.e., situations in which a recruit or probationary officer was fired for dishonesty by Varey, the same man who fired him. Under this theory, neither statistical data about the composition of the work force nor personal information that fails to meet the defendant's requirement that the situations be nearly identical to plaintiff's would be discoverable. Defendant also insists the confidentiality provisions of the Congressional Accountability Act bar disclosure of prior complaints of discrimination unless those complaints are permitted to be disclosed by that Act.

The second dispute arises from the defendant's claims that handwritten notes of investigators involved in investigating whether plaintiff cheated on the exam and plaintiff's claim that his termination was based on his race are protected from disclosure by the deliberative process and law enforcement privileges.

### This Opinion

I begin by parsing the disputed materials into various categories and then explaining why the defendant cannot limit discovery in the way it proposes. I will then require the defendant to produce more information than it has. I hasten to add, however, that I appreciate that disclosure of the names of those persons who were terminated or who took polygraph examinations would invade their privacy in the most obvious way. I, therefore, have structured the additional requirements into two stages. First, the defendant will be required to provide the information I am requiring without identifying the persons who, for example, were terminated or who took a polygraph. Whether plaintiff will be able to secure any additional information and the pertinent documents [1] will be a function of whether either the termination or the polygraph examination occurred in a situation similar enough to his situation such that plaintiff's need for additional information to make out his prima facie case or prepare to meet an anticipated defense trumps the legitimate interest other persons may have in the continued secrecy of their personal information.

I appreciate that there is a protective order in place, but we are dealing with the privacy of the persons who were terminated or who took polygraph exams. Therefore, I am reluctant to deem the defendant to be capable of waiving whatever privacy rights

---

1. As to each interrogatory in dispute, plaintiff also seeks by a request to produce documents ("RTP"), each document that "evidences, refers to or reflects any information responsive to this interrogatory."

these individuals could claim.[2] I intend to protect those rights and will not order any greater discovery than I already have unless plaintiff establishes a need for additional information.

I accept the defendant's argument that the Congressional Accountability Act precludes disclosure of complaints of discrimination other than those filed in court or made public by that Act. Hence, the privacy of the complainants and of the persons accused by them will be preserved as Congress has required.

Finally, I will reserve final decision on the applicability of the privileges the defendant claims until I see the documents claimed to be privileged.

## ANALYSIS

### The Categories of Discovery Sought

#### 1. Comparative data

The disputed information can be best described as either statistical or comparative.

#### 2. Workforce data

Plaintiff first seeks a "racial snapshot" of the present composition of the USCP workforce by demanding to know the name of each person who works for the USCP in a law enforcement capacity, his or her race, date of hire, current position and grade. Int.[3] 2. Defendant has provided this information concerning 65 persons named in the defendant's initial disclosures and plaintiff's fellow recruits, but balks at providing anything more.

#### 3. Termination data

Plaintiff seeks the race, position and identity of each person terminated since January 1, 1996[4], for misconduct. The defendant produced this information as to police officers still within their probationary period and recruit officers who were terminated or resigned in lieu of termination since May 10, 2000, the date Varey became Chief of Police. As a result, the plaintiff did not get information concerning the resignations of two non-probationary officers and two probationary officers. Only one, a non-probationary officer, faced honesty-related charges.

#### 4. Polygraph examination data

Plaintiff seeks the names of all employees who, since January 1, 1996, were ordered to submit to polygraph examinations in the investigation of their alleged misconduct. Plaintiff also seeks the race of these employees, the disposition of the investigations, and any disciplinary actions taken.

The defendant provided plaintiff with information pertaining to his own polygraph examination, but refuses to provide information concerning the administration of the polygraph in the investigation of other allegations of misconduct.

### The Subject Scope of the Discovery

#### (a) Identical Situations

 I cannot accept defendant's contention that it is not required to produce information pertaining to situations that are not identical to plaintiff's.

---

2. In any event, the defendant expressly preserved its right to object to the discovery plaintiff seeks in the protective order itself:

> 9. This Stipulated Protective Order and the production of any Confidential Information pursuant thereto are not intended as a waiver of any privilege, right, or objection. Disclosure of Confidential Information may not be compelled simply because it is covered by this Order. Further, this Stipulated Protective Order is not intended to waive any objections that may be raised at the time of trial or at any time during this Litigation.
> 10. The provisions of the Stipulated Protective Order are without prejudice to the right of any party to: (a) apply to the court for a further protective order relating to any Confidential Information or relating to discovery in this Litigation, and (b) apply to the Court for an order removing the Confidential Information designation.

*Stipulated Protective Order* ¶¶ 9, 10 (Feb. 12, 2002).

3. "Int." is an abbreviation for an interrogatory; "RTP" is an abbreviation for a request to produce documents.

4. Note that plaintiff also seeks the identity of each person involved in the investigation of any misconduct that led to termination. I take up that request in dealing with the demand for information concerning prior complaints of discrimination.

While it is certainly true that a Title VII *prima facie* case must, in this Circuit, be based on a demanding standard of near identity between the plaintiff's situation and the situation of the person to whom she compares herself to[5], it does not follow that a Title VII plaintiff must meet this standard as a condition of securing discovery. That would require a plaintiff to square the circle by having to establish, for example, that her situation is nearly identical to that of other employees in order to discover whether her situation is sufficiently similar to that of other employees to make out a *prima facie* case of racial discrimination. Imposing such a requirement on a Title VII plaintiff thus obliterates the difference between relevant evidence and "relevant information" that Fed.R.Civ.P. 26(b)(1) creates. Evidence that the defendant treated persons similarly situated differently may be relevant evidence of racial discrimination. Information that may permit such a comparison is "reasonably calculated to lead to the discovery" of relevant evidence. Fed.R.Civ.P. 26(b)(1) permits the discovery of both. Therefore, the standard is not whether the information sought pertains to a situation that is identical to plaintiff's situation, but whether it is reasonably calculated to yield information that would permit the plaintiff to argue the dissimilar treatment of the two situations is evidence of discrimination.

### (b) Temporal Scope

■ The plaintiff, who was terminated on January 8, 2001, seeks information from January 1, 1996, to the present[6], but the defendant insists that it not be obliged to produce any information that antedates the arrival of Varey who made the decision to terminate plaintiff.

I cannot accept the defendant's argument. While other decisions by the same decision-maker may establish discriminatory intent and are, therefore, admissible as prior bad acts under Fed.R.Evid. 404(a), it does not follow that decisions made by any other deci-

sion-maker are not, *ipso facto*, discoverable. An agency or business organization can act only through its agents and employees. To permit discovery only of a single decision-maker's prior decisions so atomizes the organization that it ignores the possibility that isolated decisions are the result of an organizational culture or ethos that encourages or condones discriminatory behavior. What may superficially appear to be decisions made by individual decision-makers may, when linked together, form what the courts call a "pattern or practice" of treating people of a certain protected class in a certain way. Thus, to say, that only the acts of the decision-maker who made the decision in plaintiff's case are discoverable takes as established what has never been proven, that this decision-maker acted in splendid isolation without the possibility of being influenced by anyone else in the organization. That may well be true, but to assume it is gratuitous. To require plaintiff to establish a "pattern or practice" of similarly motivated acts as a condition of getting information about other decision-makers requires, once again, that plaintiff prove her case as a condition of getting discovery.

With defendant's limitation rejected, the next question is the appropriate temporal scope of the search for similarly motivated behavior within an organization or agency. I have said of this problem:

> The problem of setting a time period for the discovery ordered is a perplexing one because it does not admit of a lapidary solution; life is messy and cannot be divided into neat chronological segments. In a case involving class-wide discrimination, responsible statistical analysis has to be based on enough data to make that analysis meaningful. Understandably, in such cases, courts permit discovery of data over an extensive period of time. *E.g., Rich v. Martin Marietta Corp.*, 522 F.2d 333, 342 (10th Cir.1975). In an individual, disparate treatment case, the courts cannot be

---

5. *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C.Cir. 1999) *quoting Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C.Cir.1995). *Accord: Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1553 (D.C.Cir.1997).

6. There may have been a subsequent agreement to limit this to the period to the two year period following plaintiff's termination, but that agreement seems to have fallen apart.

as sure handed. On the one hand, the defendant wonders why a plaintiff in such a case is entitled to any information other than the information pertaining to his own case. But that wonderment presupposes the existence of watertight compartments between individual, disparate treatment cases and pattern and practice cases that challenge agency or company-wide policies and practices in terms of the effects on individuals. *Pleasants v. Allbaugh,* 208 F.R.D. 7, 9 (D.D.C.2002).

As I stated above, the proper scope of discovery in any case is a function of the nature of that case. In this case, we are dealing with a relatively small and self-contained agency where it does not appear that many employees have been terminated or resigned when facing termination. A search from January 1, 1996, to the date of this opinion strikes a fair balance between plaintiff's need for comparative information and the burden upon the defendant to find the information I am ordering it to produce.

Thus, I will order the defendant to produce the information I am requiring for the period beginning January 1, 1996, and ending on the date this opinion is issued.

With these principles in mind, I turn to the specific controversies I have outlined.

### Composition of the Work Force

■ In addition to the information concerning plaintiff's fellow recruits and the 65 individuals named in the defendant's initial disclosures, plaintiff demands to know the name of each person who now works for the defendant, his or her race, date of hire, current position and grade. Assuming the validity of a statistical analysis of the work force as of the date of plaintiff's termination, information as to hiring and promotions has no connection to plaintiff's claim that defendant is guilty of a pattern or practice of terminating members of a protected class disproportionately. Additionally, hiring information is meaningful only if one knows the race of all the applicants. There can hardly be a pattern or practice of discriminating against members of a protected class if no members of the protected class apply for a particular position. Without a more detailed justification for why gross data as to the present racial composition of the work force is relevant to a statistical analysis, thereby advancing plaintiff's claim of an illegal termination and retaliation, defendant's refusal to provide any further information is justifiable and I will not order any additional discovery.

### Use of the Polygraph

■ Plaintiff seeks the names, positions and races of all employees ordered to submit to a polygraph. In addition, plaintiff seeks the allegations that led to the administration of the exam, the names of the persons "involved in the decision to administer the polygraph," the disposition of the exam, and any disciplinary action taken as a result of the exam. Int. 10. Defendant has provided information concerning the polygraph plaintiff took and nothing else.

In seeking information concerning the use of the polygraph, plaintiff strikes closer to the mark of seeking relevant information, but still overreaches by demanding the identity of the persons who had to submit to a polygraph. It is unnecessary to know the names of such persons in order to make a statistical comparison or to compare their individual situations to plaintiff's. Finally, producing documents pertaining to polygraphs administered to other persons is unnecessary unless there is reason to believe that the comparison between those other persons and plaintiff will yield evidence bearing on possible racial discrimination.

I will, therefore, only require the defendant to produce the following information concerning polygraph examinations administered to any person during the time period I previously indicated: (1) the race of the person to whom the test was administered; (2) the allegation against that person which led to the administration of the test; (3) the result of the polygraph examination; (4) whether the person who took the polygraph examination was thereafter disciplined in any way whether as a result of the examination or otherwise; and (5) whether any person listed in Defendant's Initial Disclosure was involved in the decision to give the exam, its administration, or the decision whether to

take any disciplinary or other action because of the test results.

I appreciate that plaintiff also alleges that the manner in which the test was administered to him was unfair because he was given a limited time within which to prepare for it. I will, therefore, also require the defendant to indicate if it knows what notice the person taking the test had that he would have to take the test.

## Termination Information

■ Plaintiff seeks the race, position, and identity of each person terminated or who resigned in lieu of termination. Int. 11. He also wants to know the date of termination, the reason for the termination, and the persons who were involved in the investigation of allegations of misconduct.

Defendant produced only the information concerning officers who were recruits or still within their probationary period who were terminated (or resigned in lieu of termination) for honesty-related charges since Varey became the Chief of Police. *Memorandum of Points And Authorities In Support of Motion For Protective Order* ("D.Memo.") at 18. As I have explained, only providing information since Varey became Chief is much too narrow. Instead, for the period from January 1, 1996, through the date of this opinion, I will require the defendant to advise plaintiff of the number of persons terminated each year, the race of each person, and the reasons for his or her termination. Defendant will also indicate whether any person listed in Defendant's Initial Disclosure was involved in either the investigation leading up to the termination or resignation or the ultimate decision to terminate the officer. Once again, I may permit more individualized information if plaintiff makes a showing of need once the defendant has complied with my order. I appreciate that another aspect of discovery may be the possibility of plaintiff's wanting to interview the persons terminated as potential witnesses and will therefore need their identities. I will deal with that problem in stages. As to each person terminated, plaintiff can secure the identity of that person only by showing me a realistic probability that the situation of that person is similar enough to

plaintiff's to permit the conclusion that a court would allow that other person to testify in plaintiff's case. Before I will permit the identity of any such witness to be revealed, I will permit the defendant to object in order to balance the privacy interest of the person terminated against the plaintiff's need for testimony or to ascertain whether that person is willing to waive any claim of privacy and speak to plaintiff's counsel.

## Prior Complaints of Discrimination

■ Plaintiff seeks the identity of any employee who has filed a complaint of discrimination or retaliation, whether in the Office of Compliance or in court. As to each such complaint, plaintiff wants to know the name of the complainant, his position, the nature of the complaint filed, its disposition, and whether, after it was filed, the complainant was subject to any form of discipline and the reason for such discipline. Int. 14.

Apparently, the parties reached an agreement that the complaints to be provided had to be premised on race, color or national origin, but plaintiff insists that he never agreed that the defendant could withhold the names of the complainants. *Plaintiff's Opposition To Defendant's Motion For Protective Order And Plaintiff's Cross Motion To Compel Discovery* ("P. Opp. & Cross Mot.") at 17 n. 4 & 20 n. 5. Once again, defendant refused to provide information as to complaints made before Varey became Chief and as to all complaints filed with the Office of Compliance.

While I reject the limitation to the period of time defendant proposes, I accept the defendant's insistence that Congress has precluded the disclosure of prior complaints of discrimination against the defendant other than those specifically made public by the Congressional Accountability Act.

In subjecting agencies within the legislative branch to monetary liability for claims of race and other discrimination, Congress created a system that requires an employee of such an agency who complains of such discrimination to engage first in counseling and then mediation. 2 U.S.C.A. §§ 1401 & 1402 (1997). Once counseling and mediation have ended, the employee must make an election.

He can either file an action in a district court or initiate an administrative proceeding by filing a complaint with the Office of Compliance. 2 U.S.C.A. § 1404 (1997). If the employee chooses the administrative remedy, a hearing officer resolves the case and either party may appeal that officer's decision to the Board of Directors of the Office of Compliance. 2 U.S.C.A. § 1406 (1997). Appeal of the decisions from this Board lies in the United States Court of Appeals for the Federal Circuit. 2 U.S.C.A. § 1407(a)(1).

Congress has elected to shield portions of this process from public inquiry. First, all counseling and mediation "shall be strictly confidential." 2 U.S.C.A. § 1416(a) & (b) (1997). Additionally, "all proceedings and deliberations of hearing officers and the Board, including any related records, shall be confidential." 2 U.S.C.A. § 1416(c) (1997). The only exception pertinent here would be for the final decisions specified in 2 U.S.C.A. § 1416(f) (1997), i.e., those made by a hearing officer or the Board of Directors in favor of an employee or by the Board if it has reversed the decision of a hearing officer in favor of an employee. 2 U.S.C.A. § 1416(f) (1997).

Plaintiff mistakenly brushes this statute aside by claiming that it only applies to records concerning the mediation and counseling functions that he does not seek. P. Opp. at 20 n. 5. Plaintiff then claims that this statute "does not empower the agency to hide during lawful discovery the identities of other employees who have alleged racial bias in their employment or the facts of their claims." *Id.* That contention is simply wrong. The statute unequivocally protects from any form of disclosure of the complaints, the proceedings, and the ultimate decision from mediation to conclusion. Indeed, the final decision is disclosed only under the limited conditions I have explained or if judicial re-

view is sought in the Federal Circuit. 2 U.S.C.A. § 1416(d) (1997). For the plaintiff in this case to secure anything else would be to violate that statute in the most obvious and inexcusable way.

Accordingly, I will require the defendant to provide all complaints of discrimination [7] on the basis of race, color, and national origin or retaliation filed by its employees for the period I have denominated, provided that the complaint was filed in a court, was made public, or is permitted to be made public pursuant to 2 U.S.C.A. § 1416 (1997).

### Privilege Claims

### Deliberative Process Privilege

As explained above, there were two investigations conducted in this case. In the first, Burton investigated whether plaintiff had cheated. When plaintiff claimed that he was victimized by discrimination because Thompson recommended his discharge, Robinson of the IAD conducted the second investigation of plaintiff's charge of discrimination.

In Document Request No. 7, plaintiff sought the production of the written report generated as a result of the investigation into plaintiff's alleged cheating. D. Memo. at 31; P. Opp. & Cross. Mot. at 22–23. Defendant objected to the request and withheld one document, a four page memorandum authored by Captain Frank Ziemba ("Ziemba") to Assistant Chief Howe.

Lieutenant Thomas Smith, the commanding officer of IAD, said of this report:

The four-page memorandum from Captain Ziemba, former commanding officer of IAD, to Assistant Chief Howe, dated October 26, 2000, consists entirely of evaluative comments about an earlier report of investigation prepared by Sergeant Richard Burton pertaining to allegations that Mr.

---

7. I have always limited discovery of other acts of discrimination to only those of the type of discrimination charged in the primary case. *White v. U.S. Catholic Conference*, 1998 WL 429842, *1 (D.D.C.1998). Defendant attempts to draw a distinction between racial discrimination and discrimination on the basis of color and national origin, however, I am afraid I do not understand this rarified distinction and defendant does not explain it. There is certainly no recognition of it

in the caselaw that I can find. As a matter of American history, I have always understood that discrimination against African Americans has been predicated on their race and their color. Indeed, they would have an equally legitimate and historically sound argument that discrimination against them is based on the origin of their ancestors on the African continent. In my view, discrimination against African Americans *is* based on their color, race, and national origin.

Waters cheated on an exam. The contents of Captain Ziemba's memo are derived entirely from Sergeant Burton's report and the IAD investigation. The memo does not refer at all to the allegations of discrimination and retaliation and does not comment in any way on whether or not discrimination or retaliation occurred. Although the memo identifies facts contained in Sergeant Burton's report, it does so only in an effort to evaluate such facts, and the facts are so intertwined with the evaluative discussion that they cannot be separated. Police departments should be encouraged to critically evaluate their own investigations in this manner in order to improve future investigations. Disclosure of this memo would have the opposite effect. Knowledge that critically evaluative memoranda such as this memo might be disclosed to future litigants would discourage investigators from undertaking such evaluations at all and would impede improvements in the investigatory process.

D. Memo. at 33, Declaration of Lieutenant Thomas Smith at ¶ 8.

Additionally, plaintiff sought documents pertaining to Robinson's investigation and any investigation into the conduct of the polygraph examiner. D. Memo. at 33. Defendant produced all the documents it had except for the investigators' notes that defendant says are "miscellaneous handwritten and typewritten notes, including lists of evidence to obtain and interview questions; notes taken during interviews; and copies of evidentiary documents with notations on them, such as under linings, circlings, questions regarding information in the documents and other comments." *Id.* (*citing* Declaration of Lieutenant Thomas Smith at ¶ 6).

■ The deliberative process privilege "covers documents reflecting advisory opinions, recommendations, and deliberations that are part of a process by which Government decisions and policies are formulated." *Dep't of the Interior and Bureau of Indian Affairs v. Klamath Water Users Protective Ass'n,* 532 U.S. 1, 8, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001) (citations omitted). The deliberative process privilege serves many purposes:

> [T]o assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

*Coastal States Gas Corp. v. Department of Energy,* 617 F.2d 854, 866 (D.C.Cir.1980). "Thus, the privilege protects documents reflecting advisory opinions, recommendations, and deliberations which contribute to the process by which governmental decisions and policies are formulated, as well as other subjective documents that reflect the personal opinions of the writer prior to the agency's adoption of the policy." *Taxation with Representation Fund v. Internal Revenue Service,* 646 F.2d 666, 677 (D.C.Cir.1981).

■ As is self-evident, the application of this privilege to the investigators' notes, as described by Lieutenant Smith ("Smith"), is a poor fit. Smith never claims that the notes taken during the interviews, interview questions, or annotations on documents constitute "opinions, recommendations and deliberations" that must be shielded lest inferiors in a government agency be inhibited in the advice they give their superiors or the public will be misled as to the reasons for the ultimate adoption of a particular policy. *Id.* Indeed, he never claims that they were created by persons who had the responsibility of recommending that a particular policy be adopted by the agency that employed them.

While the application of the deliberative process privilege to the memorandum from Ziemba to Howe comes closer to the mark because it is at least directed by an inferior to a superior, it still misses. Smith never indicates that Howe was considering any policy and sought Ziemba's views as to the wisdom of its adoption or that Ziemba, without Howe's direction, was proposing a policy for Howe to adopt. Instead, Ziemba was

speaking to a particular case and the deliberative process privilege to this point in its history speaks to the adoption of a policy that pertains to all cases of a particular type. To extend the deliberative process privilege to a recommendation as to a particular personnel matter extends it beyond its present form to protect from disclosure what would otherwise be evidence relevant to a plaintiff's complaint of discrimination. Extension of the deliberative process privilege to such personnel matters when discrimination is charged is impossible in this Circuit. The Court of Appeals has indicated that it is inconceivable that Congress intended federal agencies to shield from discovery information otherwise subject to the deliberative process privilege when that information bears on whether or not the agency discriminated against an employee:

> Appellant's primary argument is that the common law deliberative process privilege is not appropriately asserted—as the district court in Massachusetts appeared to recognize—when a plaintiff's cause of action turns on the government's intent. We agree. The privilege was fashioned in cases where the governmental decision-making process is collateral to the plaintiff's suit. *See e.g., In re Subpoena Served Upon the Comptroller of the Currency,* 296 U.S.App. D.C. 263, 967 F.2d 630 (D.C.Cir.1992)(shareholders sought Comptroller's bank examination reports to prove fraud charges against corporation); *Singer Sewing Machine Co. v. NLRB,* 329 F.2d 200 (4th Cir.1964)(petitioner wanted deliberative materials to establish a defense to an unfair labor practice charge). If the plaintiff's cause of action is directed at the government's intent, however, it makes no sense to permit the government to use the privilege as a shield. For instance, it seems rather obvious to us that the privilege has no place in a Title VII action or in a constitutional claim for discrimination. *See Crawford–El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988). The Supreme Court struggled in Crawford–El and Webster with governmental claims that discovery in such a proceeding should

be limited, but no one in any of these cases ever had the temerity to suggest that the privilege applied. The argument is absent in these cases because if either the Constitution or a statute makes the nature of governmental officials' deliberations the issue, the privilege is a non sequitur. The central purpose of the privilege is to foster government decisionmaking by protecting it from the chill of potential disclosure. *See N.L.R.B. v. Sears, Roebuck & Co.,* 421 U.S. 132, 150, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975). If Congress creates a cause of action that deliberately exposes government decisionmaking to the light, the privilege's *raison d'etre* evaporates.

*In re Subpoena Duces Tecum,* 145 F.3d 1422, 1424 (D.C.Cir.1998).

Here, the Congressional Accountability Act, like Title VII, places the government's termination of plaintiff directly at issue and asks whether, in doing so, the government acted with the intent to discriminate and retaliate. The document at issue is far from being collateral to that inquiry. It may bear directly on that intent since Ziemba's memorandum speaks directly to Burton's investigation of plaintiff's alleged cheating on the exam and plaintiff's charge is that Burton discriminated against him on the basis of his race. To immunize from discovery a document that speaks directly to Burton's investigation into plaintiff's cheating in the teeth of plaintiff's charge that Burton discriminated against him during the course of that investigation, is to engage in the very *non sequitur* the Court of Appeals condemned in the case just quoted.

On the basis of Smith's declaration, I am hard pressed to see how the deliberative process privilege applies to Ziemba's memorandum. I concede, however, that I have not seen the document itself. In what may be an excess of caution, I will first order the document produced for my *in camera* review. I will then make a final decision as to whether plaintiff may have it. Finally, I note that the deliberative process privilege is not absolute, but may yield to a showing of need. *Cobell v. Norton,* 213 F.R.D. 1, 3–5 (D.D.C.2003). If I determine that the deliberative process applies to this document, I may require sup-

plemental briefing on the question of whether a deliberative process privilege pertains to it and whether plaintiff's need for it nevertheless compels its disclosure.

## Law Enforcement Privilege

Police departments and law enforcement agencies often find themselves in civil rights litigation against citizens who complain of police invasion of their constitutional rights and against their own employees who may claim various forms of employment discrimination. Thus, police files may contain documents that pertain to those complaints yet remain privileged from discovery. This is because a court concludes that the societal interest in the preservation of the confidentiality of those files trumps the societal interest in the effective enforcement of the civil rights laws. In this Circuit, the factors that must be weighed against each other in determining whether the law enforcement privilege applies to such law enforcement files are identified in *Tuite v. Henry*, 98 F.3d 1411, 1417 (D.C.Cir.1996). Since there are only a small number of documents as to which this privilege is claimed, I will order them produced for my *in camera* inspection. I will then do the necessary balancing of competing interests. *See McPeek v. Ashcroft*, 202 F.R.D. 332 (D.D.C.2001).

## Personnel Files

■ Plaintiff demands the personnel files, except for medical and benefits information, of (1) persons he accuses of discriminatory action, (2) persons involved in the decision-making process and (3) other employees that have information regarding plaintiff's claims. P. Opp. & Cross Mot. at 18–19. Defendant produced documents in these files "to the extent they relate to Plaintiff or findings of race discrimination or retaliation." D. Memo. at 38. Plaintiff insists on production of the entire file of each person to find information that might, for example, impeach a witness' credibility by showing that the officer got a pay raise or promotion to reward him or her for providing information to the investigators who investigated plaintiff's complaint. Plaintiff insists on a broad right to search these files for ten years of information as to assignments, position descriptions,

performance appraisals and disciplinary actions. P. Opp. at 18.

First, plaintiff was a recruit when he was fired in 2001 after what I have to believe was a few months of training. To demand information for years prior to his arrival does not make any sense. Second, witnesses can be impeached by prior bad acts that bear on their honesty. Fed.R.Evid. 608(b). Additionally, as I have indicated, prior bad acts indicating a discriminatory or retaliatory intent may be admissible in plaintiff's direct case. Information concerning the witnesses' position descriptions and assignments cannot possibly yield such information. The only material information in the personnel files would be information that bears on the witness' honesty or credibility or which disclose a discriminatory or retaliatory intent. I will, therefore, only require the defendant to produce from the personnel files, for the time period I have indicated, any information suggesting that the person acted in a dishonest manner, gave an untruthful statement, or engaged in racially discriminatory or retaliatory behavior.

As I have indicated, I appreciate that plaintiff also seeks to explore whether a witness is biased because he or she received a pay raise or bonus "shortly before giving a statement about the case." P. Opp. at 18. While that is just this side of fanciful, I will, in the exercise of my discretion, require the defendant to produce any document from any of the concerned persons' personnel files that shows a pay raise, bonus, or promotion within six months of that persons' giving a statement to anyone about the events at issue in this case relating to the investigations by Burton or by Robinson.

## Phone Numbers

Plaintiff uses the word "identify" in its discovery request to require the defendant to provide (*inter alia*) the person's home address and phone number of its employees. Defendant objects to providing the home addresses and phone numbers of its officers and commits itself to producing any employee needed for deposition and indicates that

"[p]laintiff has the means to contact potential witnesses at work." P. Opp. at 41.

In these troubled times, unnecessary disclosure of the home addressees and phone numbers of law enforcement officers should be avoided. Defendant's willingness to produce the officers for deposition upon reasonable notice and its lack of objection to plaintiff's contacting them informally at work will suffice. I will, therefore, not require defendant to provide home addresses and phone numbers.

An Order accompanies this Memorandum Opinion.

## ORDER

In accordance with the accompanying Memorandum Opinion, it is, hereby,

**ORDERED** that defendant's *Motion For Protective Order* [# 24] is **GRANTED** in part and **DENIED** in part. It is further, hereby,

**ORDERED** that plaintiff's *Cross Motion to Compel Discovery* [# 35] is **GRANTED** in part and **DENIED** in part. It is further, hereby,

**ORDERED** that the defendant produce to the plaintiff the following information within thirty (30) days of the issuance of this Order:

| Category of Information Requested | What Defendant Is Ordered To Produce |
|---|---|
| Polygraph examinations | From the time period of January 1, 1996, to the date of this Order, defendant shall produce (1) the race of the person to whom the examination was administered; (2) the allegation which led to the administration of the examination; (3) its result; (4) whether the person who took the examination was disciplined as a result of the examination; and (5) whether any person listed in the Defendant's Initial Disclosure was involved in the decision to give the examination, its administration, or decision to take disciplinary action as a result. |
| Termination Information of Other Officers | From the time period of January 1, 1996, to the date of this Order, defendant shall produce (1) the number of persons who were terminated from employment or resigned in lieu of termination each year; (2) the race of each such person; and (3) the reason. Additionally, defendant shall produce documents as to whether any person listed in Defendant's Initial Disclosure was involved in an investigation which led to the termination or resignation of an officer, in lieu of termination. |
| Prior Complaints of Discrimination | From the time period of January 1, 1996, to the date of this Order, defendant shall produce information regarding prior complaints of race, color, and national origin discrimination and retaliation filed in a court or made public pursuant to 2 U.S.C.A. § 1416(d) (1997). |
| Personnel Files | From the time period of January 1, 1996, to the date of this Order, defendant shall produce from the personnel files of the eighteen (18) individuals named in Plaintiff's Document Request No. 15 documents that suggest an officer has acted in a dishonest manner, gave an untruthful statement, or engaged in racially discriminatory or retaliatory behavior. The defendant will also be required to produce documents which may |

| | indicate in an officer's personnel file a pay raise or bonus within six (6) months of any person giving a statement about the events at issue in this case relating to the investigations by Burton or by Robinson. |
|---|---|
| Ziemba Memorandum and IAD Investigators Notes | Defendant shall produce these documents for my *in camera* review. |

**SO ORDERED.**