# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-2215

ENVIRO TECH INTERNATIONAL, INC.,

*Plaintiff-Appellant*,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 4650—**Amy J. St. Eve**, *Judge.*

_____

ARGUED NOVEMBER 6, 2003—DECIDED JUNE 10, 2004

_____


Before CUDAHY, MANION, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.*   Enviro Tech International, Inc. ("Enviro Tech"), filed this action seeking judicial review of the United States Environmental Protection Agency's ("EPA's") refusal to produce certain documents in response to Enviro Tech's request under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"). The EPA asserted, and the district court agreed, that the withheld documents were exempt from disclosure under section 552(b)(5) pursuant to the so-called deliberative process privilege. Enviro Tech

appeals, asserting that the withheld documents relate to actions that are beyond the scope of the EPA's statutory authority and that the deliberative process privilege does not exempt from disclosure materials relating to such *ultra vires* conduct. We affirm.

## I.

As a party to the 1987 Montreal Protocol on Substances that Deplete the Ozone Layer, the United States undertook to freeze and ultimately to reduce the production and use of chlorofluorocarbons and other chemicals that have a deleterious effect on the stratospheric ozone layer. In 1990 amendments to the Clean Air Act, Congress established timetables for phasing out the production and use of ozone-depleting substances ("ODS"). *See* 42 U.S.C. § 7671c-e. However, concerned with the safety of the alternatives to ODS, Congress also provided that "[t]o the maximum extent practicable, [ODS] shall be replaced by chemicals, product substitutes, or alternative manufacturing processes that reduce overall risks to human health and the environment." § 7671k(a). In furtherance of that objective, Congress ordered the EPA to take a series of steps. First, the EPA was to take the lead in establishing programs, initiatives, and other activities aimed at identifying, evaluating, and developing alternatives to ODS. § 7671k(b). Second, the EPA was to promulgate rules prohibiting the replacement of any ODS with an alternative that itself poses a danger to human health or the environment, so long as the EPA has identified another substitute that reduces the potential risk to human health and the environment and is currently or potentially available. § 7671k(c). Finally, the EPA was to develop a list of substances that are "safe alternatives" for specific uses and a separate list of substitutes that are prohibited for specific uses. *Id.* The legislation also allows any person to petition the EPA either to add a substance to

or remove it from one of these lists. § 7671k(d). In 1994, the EPA established the Significant New Alternatives Policy ("SNAP") program to carry out these directives.

Enviro Tech, a company based in Melrose Park, Illinois, markets a line of industrial solvents based on the chemical compound n-propyl bromide ("nPB"). In 1996, Enviro Tech filed a petition with the EPA seeking to have nPB identified as an acceptable alternative for ODS under the SNAP program. As part of its evaluation process, the SNAP program engaged a private contractor to review the scientific literature on the toxicity of nPB and to recommend a workplace exposure limit for this chemical. In January 2002, before the EPA had issued a proposed rule on the acceptability of nPB as an ODS substitute, Enviro Tech served a FOIA request on the EPA seeking any documents related to the potential toxicity of nPB and the agency's evaluation of that toxicity. EPA released a number of documents in response to Enviro Tech's request, but ultimately withheld 37 documents on the ground that these fell within the deliberative process exception to FOIA. That exception, as we explain more fully below, permits an agency to withhold from public disclosure records relating to the agency's internal evaluation and formulation of policy.

After exhausting its administrative remedies, Enviro Tech filed suit in the district court seeking judicial review of the EPA's decision. *See* 5 U.S.C. § 552(a)(4)(B). On cross-motions for summary judgment, the district court concluded in relevant part that because the withheld documents were protected by the deliberative process privilege, FOIA Exemption 5 relieved the EPA of the obligation to produce them. *Enviro Tech Int'l, Inc. v. U.S.E.P.A.*, No. 02 C 4650, Memorandum Opinion and Order at 10-15 (N.D. Ill. Mar. 11, 2003) ("Mem. Op."). The court found that the documents in question satisfied the two criteria for the privilege in that they were both "predecisional and deliberative" in nature. *See* Mem. Op. at 11, citing *Becker v. I.R.S.*, 34 F.3d 398, 403 (7th Cir. 1994):

> . . . The documents are predecisional because they were prepared to assist the [EPA] in preparing the recommendation for a workplace exposure limit for nPB and the documents were generated before the EPA made available to the public for review and comments the final draft report containing that recommendation.
>
> Further, the documents are deliberative because they relate to the process by which the EPA arrived at the final draft report. The documents reflect internal discussions of proposals, suggestions, and recommendations as well as early versions of the final draft report eventually made available to the public. Such materials are routinely shielded from disclosure by the deliberative process privilege under FOIA Exemption 5.

Mem. Op. at 12 (citations omitted). The court went on to reject Enviro Tech's contention that the EPA could not invoke the deliberative process privilege as to these documents because it lacks statutory authority to regulate workplace exposure limits for nPB. The court distinguished *Weissman v. C.I.A.*, 565 F.2d 692, 694-96 (D.C. Cir. 1977), which held that the Central Intelligence Agency ("CIA") could not invoke the "law enforcement purpose" exemption under FOIA, *see* § 552(b)(7), because the CIA was statutorily barred from engaging in any law enforcement activity. "Exemption 5 itself contains no language restricting its application to only those agency activities specifically authorized by Congress." Mem. Op. at 14. The court also noted that subsequent cases had declined to extend *Weissman*'s *ultra vires* rationale to other FOIA exemptions. *Id.*

Subsequent to the district court's decision in the EPA's favor, the EPA in June 2003 issued a Notice of Proposed Rulemaking that proposed to list nPB as acceptable for use, *inter alia*, as a solvent. 68 Fed. Reg. 33284 (June 3, 2003) (the "Notice"). The text of the Notice explains that upon

review of a proposed ODS substitute, "the [EPA] may make a determination that a substitute is acceptable only if certain conditions of use are met to minimize risks to human health and the environment." *Id.* at 33287. The EPA has made such a determination with respect to nPB, concluding that it is an acceptable substitute for certain types of ODS, subject to use conditions. *Id.* at 33288. Among the use conditions specified for nPB is a guideline recommending that workers inhale no more than an average of 25 parts per million ("pph") of the chemical over the course of an eight-hour workday. *Id.* The Notice makes clear that this is a recommended rather than a mandatory limit on workplace exposure to nPB and that the authority to establish a binding limit lies solely with the Occupational Safety and Health Administration ("OSHA"), which as of yet has established no such limit. *See id.* at 33288, 33289-90, 33300, 33310.

> In the future, OSHA may develop a mandatory exposure limit for nPB use in the workplace. The result of OSHA's review could result in a permissible exposure limit (PEL) different from EPA's recommended exposure limit of 25 ppm. . . . As stated earlier in this preamble, EPA defers to OSHA in regulating workplace safety. The recommended [acceptable exposure limit (AEL)] in today's proposal is an interim measure in the absence of an OSHA PEL. Thus, any PEL that OSHA sets would supersede EPA's recommended AEL.

*Id.* at 33300. Public comments on the EPA's proposed rule as to nPB were solicited with a due date of August 4, 2003. The agency is expected to issue a final rule sometime this year.

## II.

Typically, we review a district court's summary judgment disposition of a FOIA request to determine whether the

district court had a sufficient factual basis for its ruling and, if so, whether the court's decision was clearly erroneous. *Solar Sources, Inc. v. United States*, 142 F.3d 1033, 1038 (7th Cir. 1998). We have acknowledged that use of the clearly erroneous standard is in tension with the de novo standard that normally governs our review of summary judgment decisions. *See id.* at 1038 n.5 (citing *Becker v. I.R.S.*, *supra*, 34 F.3d at 402 n.11). We have also recognized that the courts of appeals are divided as to the appropriate standard of review in FOIA cases decided by way of summary judgment. *Id.* Indeed, our own case law is not entirely consistent on this point. *See In re Wade*, 969 F.2d 241, 245 (7th Cir. 1992), and *Kaganove v. E.P.A.*, 856 F.2d 884, 886 (7th Cir. 1988) (engaging in de novo review). Review for clear error remains the norm for FOIA cases in this circuit. *Solar Sources*, 142 F.3d at 1038 & n.5.

FOIA requires a federal agency upon request to disclose records in its possession, subject to nine exemptions. § 552(a), (b). Disclosure is required unless the requested record is clearly exempted from disclosure by the statute. *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 136, 95 S. Ct. 1504, 1509 (1975). In view of the mandate for broad disclosure, those exemptions are to be construed narrowly. *U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 8, 108 S. Ct. 1606, 1611 (1988). The government bears the burden of proving by a preponderance of the evidence that a withheld document falls within one of the exemptions. § 552(a)(4)(B).

Exemption 5 exempts from mandatory disclosure communications that are "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." § 552(b)(5). "This language clearly contemplates that the public is entitled to all such memoranda or letters that a private party could discover in litigation with the agency." *E.P.A. v. Mink*, 410 U.S. 73, 85-86, 93 S. Ct. 827, 835

(1973). Conversely, if a private litigant could not obtain certain records from the agency in discovery, Exemption 5 relieves the agency of the obligation to produce that document to a member of the public. *Sears*, 421 U.S. at 148, 95 S. Ct. at 1515. Civil discovery rules thus inform the inquiry into what may or may not be withheld pursuant to Exemption 5, although, in view of the circumstances distinguishing a FOIA request from run-of-the-mill civil litigation, those rules can be applied only "by way of rough analogies." *Mink*, 410 U.S. at 86, 93 S. Ct. at 835. One such rule that Exemption 5 does incorporate is that documents reflecting the deliberative or policy-making processes of governmental agencies are privileged from disclosure. *Id.* at 86-87, 93 S. Ct. at 835-36; *see also Sears*, 421 U.S. at 149, 95 S. Ct. at 1516.

> The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government.

*Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9, 121 S. Ct. 1060, 1066 (2001) (internal quotation marks and citations omitted); *see also United States v. Nixon*, 418 U.S. 683, 705, 94 S. Ct. 3090, 3106 (1974) ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."). Consistent with its purpose, the deliberative process privilege typically does not justify the withholding of purely factual material, *Mink*, 410 U.S. at 87-88, 93 S. Ct. at 836, nor of documents reflecting an agency's final policy decisions, *Sears*, 421 U.S. at 151-54, 95 S. Ct. at 1516-18, but it does apply to predecisional policy discussions, *id.* at 153, 95 S.

Ct. at 1517-18, and to factual matters inextricably inter-twined with such discussions, *Mink*, 410 U.S. at 91-21, 93 S. Ct. at 838. Thus, in order to qualify for the privilege, a document must be both predecisional in the sense that it is "actually [a]ntecedent to the adoption of an agency policy," and deliberative in the sense that it is "actually . . . related to the process by which policies are formulated." *Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 774 (D.C. Cir. 1978) (en banc), *overruled in part on other grounds by Crooker v. Bureau of Alcohol, Tobacco, & Firearms*, 670 F.2d 1051 (D.C. Cir. 1981) (en banc); *see also Becker*, 34 F.3d at 403; *United States v. Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993); *King v. I.R.S.*, 684 F.2d 517, 519 (7th Cir. 1982).

As we have noted, the district judge found that the 37 documents at issue in this case meet both of the criteria for the privilege—they predate public release of the EPA's proposed rule establishing, among other things, a recom-mended workplace exposure limit for nPB, and they reflect the internal dialogue at the EPA regarding the proposals, suggestions, recommendations, and early draft versions of the proposed rule on nPB. Mem. Op. at 12. Enviro Tech does not quarrel with the district court's assessment. Again, Enviro Tech's sole contention is that the EPA lacks author-ity to propose a workplace exposure limit for nPB and, as a result, the deliberations that culminated in the agency's proposal of such a limit are beyond the scope of the deliber-ative process privilege.

*Weissman v. C.I.A.*, *supra*, 565 F.2d 692, is the principal authority that Enviro Tech cites in support of its *ultra vires* argument. The plaintiff in *Weissman*, upon learning that the CIA had been investigating left-of-center political activists, had asked the CIA to produce any information it had compiled regarding his own political activities. As it turned out, the CIA, unbeknownst to the plaintiff, had identified him as a possible recruit for employment as an informant and had monitored his activities on and off over a five-year period. The agency produced some documents in

response to the plaintiff's FOIA request, but withheld others on the basis of, *inter alia*, Exemption 7, which shields from disclosure records compiled for law enforcement purposes. § 552(b)(7). The District of Columbia Circuit accepted the CIA's representation that it had monitored the plaintiff's activities in a genuine effort to ascertain whether he might be an appropriate candidate for recruitment. Nonetheless, it rejected the notion that this sufficed as a basis for withholding the records of that monitoring under FOIA's law enforcement exemption. The statute that created the CIA and authorized it to gather intelligence related to national security expressly provided that the agency was to have no law enforcement authority. "This directive was intended, at the least, to prohibit the CIA from conducting secret investigations of United States citizens, in this country, who have no connection with the Agency." *Id.* at 695. "Congress had a realistic fear of secret police that would move inward rather than outward, and assume prerogatives never intended." *Id.* As a result, to the extent that the CIA was purporting to have engaged in law enforcement when it monitored the plaintiff's political activities, it was conducting activity that Congress had expressly forbidden it to conduct.

> A full background check within the United States of a citizen who never had any relationship with the CIA is not authorized, and the law-enforcement exemption is accordingly unavailable. The Agency simply has no authority in the guise of law enforcement to make such a background check of Weissman with a view to his possible recruitment.

*Id.* at 696.

*Weissman* does not put into doubt the EPA's ability to invoke the deliberative process privilege. The parties have cited no case, and we can find none, that applies *Weissman* in evaluating an agency's reliance on the deliberative process privilege, and it is not immediately apparent that *Weissman*'s *ultra vires* rationale would translate readily

into the latter context. The privilege at issue in *Weissman* was confined to a particular activity—law enforcement— in which the CIA was expressly forbidden to engage. The formulation of policy, by contrast, is not something that is foreclosed to the EPA or to any other agency; and although there are obviously limits to each agency's policymaking authority, it might well be difficult to delineate when an agency's internal, predecisional discussions are *ultra vires*, in the sense that they address potential courses of action that are wholly beyond the legitimate scope of the agency's mission, and when they are not. Along the way to formulating a policy that is within its power to implement, an agency might legitimately identify and consider a host of alternatives, some within the agency's power to effectuate and some without. The agency might, indeed, consider the boundaries of its own jurisdiction. Deeming internal discussions unprotected by the deliberative process privilege because, in retrospect, it appears that the agency was considering proposals that were beyond the scope of its authority to implement might well discourage the kind of frank and appropriate policymaking discussions that the privilege was meant to protect and promote.

Nonetheless, we may assume for the sake of argument that the scope of an agency's authority places some limits on the deliberate process privilege, and that internal communications about something not even arguably within the agency's domain might not be privileged. Perhaps if EPA staff members were to begin mapping out policy on something like school prayer, for example, then the privilege would not apply. We may likewise assume, looking to another line of cases that Enviro Tech cites to us, that internal discussions about a course of agency action that would be nefarious, if not illegal, likewise would not be protected by the deliberative process privilege. *See Tax Reform Research Group v. I.R.S.*, 419 F. Supp. 415, 426 (D.D.C. 1976) (documents relating to White House efforts to

use Internal Revenue Service against its political enemies "simply cannot be construed as being part of any proper governmental process"); *see also Dema v. I.R.S.*, 1979 U.S. Dist. LEXIS 9025, at *6 (N.D. Ill. Oct. 22, 1979) (noting that documents in question "do not reflect any governmental impropriety, but rather are 'part of the legitimate governmental process intended to be protected by Exemption 5' ") (quoting *Tax Reform Research Group*, 419 F. Supp. at 426); *Hearnes v. I.R.S.*, 1979 WL 1428, at *6 (E.D. Mo. July 2, 1979) ("Plaintiff argues correctly that he is entitled to papers and documents which indicate that political abuses were committed by the Internal Revenue Service.") (footnote omitted) (citing *Tax Reform Research Group*); *see also In re Sealed Case*, 121 F.3d 729, 746 (D.C. Cir. 1997) (suggesting in dicta that deliberative process privilege "disappears altogether when there is any reason to believe that government misconduct occurred").

But we are far from such a case here. Although Enviro Tech contends that the EPA has no authority to establish a workplace exposure limit on nPB (a responsibility that, Enviro Tech emphasizes, lies solely with OSHA), Congress has charged the EPA with the task of evaluating the safety of alternatives to ODS and identifying substitutes that are either safe or prohibited for specific uses. 42 U.S.C. § 7671k(b), (c). It is, at the least, arguable that identifying the exposure limits within which a particular ODS substitute is safe is a task subsumed within that charge. Moreover, as the Notice of the proposed rule on nPB reflects, the EPA has only promulgated a *recommended* limit on workplace exposure; the Notice expressly defers to OSHA's authority to establish a binding workplace exposure limit. We hasten to add that it is not within our own authority to decide whether the recommended limit, or any other aspect of the EPA's proposed rule (once finalized), is within the EPA's power; that task belongs to our colleagues on the District of Columbia Circuit. 42 U.S.C. § 7607(b); *see*

*Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901, 914 n.6 (7th Cir. 1990). It is enough for us to say that a recommended workplace exposure limit for nPB is not so patently beyond the scope of the EPA's authority as to preclude the agency from having internal discussions about it or to invoke the deliberative process privilege.

## III.

We find no clear error in the district court's conclusion that the 37 documents in issue are protected by the deliberative process privilege. There is no dispute that these documents are both predecisional and deliberative. To the extent that the privilege might not apply to internal agency discussions of a proposal that is wholly beyond the agency's authority or unrelated to a legitimate governmental purpose, a question we do not resolve, we are satisfied that a recommended exposure limit on use of an ODS substitute does not amount to such a plainly *ultra vires* course of action. The EPA was therefore entitled to invoke the deliberative process privilege as to the consideration of such a recommended limit.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*