**Dorothy HOLMES, on her own behalf and as Special Administrator of the Estate of Ronald Johnson III, Plaintiff,**

v.

**George HERNANDEZ and the City of Chicago, Defendants.**

**No. 14 C 8536**

United States District Court,
N.D. Illinois, Eastern Division.

Signed 11/21/2016

Jon F. Erickson, Ronak P. Maisuria, Jon Robert Neuleib, Michael D. Oppenheimer, Erickson & Oppenheimer, Ltd., Jared Samuel Kosoglad, Jared S. Kosoglad P.C., Chicago, IL, for Plaintiff.

Steven Blair Borkan, Graham P. Miller, Krista Eleanore Stalf, Timothy P. Scahill, Whitney Newton Hutchinson, Borkan & Scahill, Ltd., Josh Michael Engquist, Christopher A. Wallace, Christopher A. Wallace, Bret Anthony Kabacinski, Caroline Jane Fronczak, Marion Claire Moore, Marshall Keith Martin, Raoul Vertick Mowatt, City of Chicago, Department of Law, Kevin R. Gallardo, Kevin R. Gallar-

do, Jackson Lewis P.C., Barrett Elizabeth Boudreaux, Jonathan Clark Green, Chicago Corporation Counsel, Jason Fay Cunningham, Chicago, IL, for Defendants.

### ORDER

Honorable Edmond E. Chang, United States District Judge

On October 12, 2014, Chicago Police Officer George Hernandez fatally shot Ronald Johnson III. R. 106, Third Am. Compl. ¶¶ 6, 8.[1] Johnson's mother, Dorothy Holmes, filed this lawsuit against the Chicago and Hernandez on her own behalf and as Special Administrator of her son's estate. The parties are in the midst (though toward the tail end) of fact discovery. *See* R. 189, 08/08/16 Minute Entry. Holmes has moved to compel the production of draft summary reports from the Independent Police Review Authority (IPRA), the agency currently responsible for investigating police misconduct in Chicago. *See* R. 175, Pl.'s Mot. to Compel. This Order solely addresses the deliberative process privilege[2] as it applies to the draft summary reports, and overrules the City's objection on this ground. But the parties and the Court are still assessing the extent to which compelling production of those reports would be unduly burdensome, which will be the subject of yet another round of discussion at the status hearing of November 22, 2016.

### I. Background

In addition to the Fourth Amendment excessive force claim against Officer Hernandez, Holmes asserts a *Monell* claim against Chicago, alleging that Chicago's failure to investigate and to discipline police misconduct caused Hernandez's use of excessive force. *See* Third Am. Compl. Holmes also brings Illinois state-law claims against both Defendants. *Id.*

After some wheel-spinning in discovery on the *Monell* claim, in March 2016 the Court ordered Holmes to directly subpoena IPRA, the city agency currently in charge of investigating police misconduct in Chicago, for the investigation files of police shootings in the time period October 12, 2009 through October 12, 2014 (that is, for the five years leading up to Hernandez's shooting of Johnson). *See* R. 161 (motion hearing of 03/17/2016). In response to the subpoena, IPRA agreed to produce the investigation files for those shootings. *See* R. 179, IPRA Resp. Br. at 5. An investigation file contains the *final* summary report, which is "a compilation of the evidence the investigators believe—based on their internal deliberations—are most relevant to the issues raised in a particular investigation." R. 196, IPRA Supp. Resp. Br. at 2. But IPRA invoked the deliberative process privilege and refused to produce any *draft* summary reports generated during the investigations. *See* IPRA Resp. Br. at 4–9; IPRA Supp. Resp. Br. According to IPRA, its investigators and supervisors engage in a back-and-forth dialogue over these drafts in the lead-up to generating the final summary report. IPRA Resp. Br. at 4.) Holmes wants to see the draft summary reports.

### II. Legal Standard

 Federal Rule of Civil Procedure 26(b)(1) states that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of

---

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, and supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367. Citations to the docket are "R." followed by the entry number, and when necessary, the page/paragraph number.

2. Courts also refer to the privilege as the "official information privilege" or the "executive privilege." *See Evans v. City of Chi.,* 231 F.R.D. 302, 315 (N.D. Ill. 2005)

the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." A party claiming that otherwise discoverable information is privileged must "expressly make the claim," and "describe the nature of the documents, communications, or tangible things ... in a manner ... that will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A); *see also* Fed. R. Civ. P. 45(e)(2)(A). This means that the burden rests upon the party objecting to disclosure to show why the information is privileged. *See Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 235 F.R.D. 447, 450 (N.D. Ill. 2006). Finally, district courts have broad discretion when ruling on discovery-related issues, including motions to compel brought under Rule 37(a). *See Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 629 (7th Cir. 2008); *see also* Fed. R. Civ. P. 37(a).

### III. Analysis

Holmes contends that the draft summary reports are relevant to her *Monell* claim, which alleges that IPRA engaged in a widespread practice of "refusing to find complaints with merit justified or recommend discipline even where the officer has engaged in excessive force ...." Third Am. Compl. ¶ 47; *see also* Pl.'s Mot. to Compel at 2. For its part, IPRA maintains that even if the draft summary reports are relevant, they are nevertheless protected by the deliberative process privilege. *See* IPRA Resp. Br. at 4–9; R. 196, IPRA Supp. Resp. Br.; R. 216, IPRA Second

Supp. Resp. Br. at 2–3. Those drafts are "part of an internal dialogue" between investigators and supervisors that happens before IPRA issues a final summary report. IPRA Resp. Br. at 4. IPRA points out that it has agreed to produce "formal non-concurrence memorandums," and at one time IPRA said that it also would disclose "any draft summary report that is the only evidence of a non-concurrence in a closed investigation." IPRA Resp. Br. at 5. Those disclosures, in IPRA's view, undermine Holmes's need for all of the other draft summary reports. (" 'Non-concurrence' is the term IPRA uses when a member of the investigative staff does not agree with the findings that ultimately are conveyed in a final summary report." IPRA Supp. Resp. Br. at 2.) In addition to asserting the privilege, IPRA also argues that "[c]ollecting these draft summary reports, which may number close to or over a thousand," would be unduly burdensome. IPRA Resp. Br. at 9. To support these arguments, IPRA submitted a declaration signed by its General Counsel. *See* R. 179–1 at 6, O'Shaughnessy Decl.

The deliberative process privilege "serves to protect the quality of the flow of ideas within a government agency." *United States v. Bd. of Educ. of the City of Chi.*, 610 F.Supp. 695, 697 (N.D. Ill. 1985); *accord United States v. Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993) ("Since frank discussion of legal and policy matters is essential to the decisionmaking process of a governmental agency, communications made prior to and as a part of an agency determination are protected from disclosure."). To this end, the privilege shields "communications that are part of the decision-making process of a governmental agency."[3] *Farley*, 11 F.3d at 1389 (citing

---

**3.** Because the *Monell* claim is a federal-law claim, asserted under 42 U.S.C. § 1983, federal common law principles govern whether the deliberative process privilege applies to IPRA's draft summary reports. *See United States v. Zolin*, 491 U.S. 554, 562, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989); *see also* Fed. R. Evid. 501.

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150–52, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975)). These communications include "documents reflecting advisory opinions, recommendations[,] and deliberations comprising part of the process by which governmental decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Assoc.*, 532 U.S. 1, 9, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001) (citing *Sears, Roebuck & Co.*, 421 U.S. at 150, 95 S.Ct. 1504).

■■■■ In order for the privilege to apply, however, the documents must be both "'predecisional'—generated before the adoption of an agency policy—and 'deliberative'—reflecting the give and take of the consultative process." *Cont'l Ill. Nat'l Bank & Trust Co. of Chi. v. Indem. Ins. Co. of N. Am.*, 1989 WL 135203, at *2 (N.D. Ill. Nov. 1, 1989); *accord Becker v. IRS*, 34 F.3d 398, 403 (7th Cir. 1994). This means that the privilege does not extend to "factual or objective material," or to documents that "an agency adopts . . . as its position on an issue." *Cont'l Ill.*, 1989 WL 135203, at *2; *accord Enviro Tech Int'l, Inc. v. U.S. E.P.A.*, 371 F.3d 370, 374 (7th Cir. 2004). Neither does the privilege extend to "[c]ommunications made subsequent to an agency decision . . . ." *Farley*, 11 F.3d at 1389.

■■■ There is a two-step process for determining whether the privilege applies: first, the government must show that the privilege applies to the documents at issue. *See Evans*, 231 F.R.D. at 316; *Ferrell v. U.S. Dep't of Hous. and Urban Dev.*, 177 F.R.D. 425, 428 (N.D. Ill. 1998). If the government makes out a prima facie case for applying the privilege, then the burden shifts to the party seeking disclosure to establish "a 'particularized need' for the documents." *Evans*, 231 F.R.D. at 316 (quoting *Farley*, 11 F.3d at 1389; *Ferrell*, 177 F.R.D. at 429). The Court addresses each party's burden in turn.

## A. IPRA's Prima Facie Case

■■■ IPRA must make a formal claim of the deliberative process privilege in order to keep the draft summary reports under wraps. *See United States v. Reynolds*, 345 U.S. 1, 7–8, 73 S.Ct. 528, 97 L.Ed. 727 (1953). To satisfy this burden, "three things must happen: (1) the department head with control over the matter must make a formal claim of privilege, after personal consideration of the problem; (2) the responsible official must demonstrate, typically by affidavit, precise and certain reasons for preserving the confidentiality of the documents in question; and (3) the official must specifically identify and describe the documents." *K.L. v. Edgar*, 964 F.Supp. 1206, 1209 (N.D. Ill. 1997); *accord Reynolds*, 345 U.S. at 7–8, 73 S.Ct. 528 ("There must be formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer.") (footnotes omitted).

■■■ Here, IPRA relies on a declaration signed by its General Counsel, Helen O'Shaughnessy, to establish that the deliberative process privilege applies to the draft summary reports. *See* O'Shaughnessy Decl. In her declaration, O'Shaughnessy states that she is "familiar with IPRA's performance of its investigations and the records associated with [IPRA's] investigations," including draft summary reports. *Id.* ¶¶ 1–2. Because those reports contain "pre-decisional findings," O'Shaughnessy asserts that "[she], and IPRA, consider [those reports] to be protected by the deliberative process privilege." *Id.* ¶¶ 2, 4. She further asserts that "[c]ompelling IPRA investigat[or]s and supervisors to disclose their pre-decisional deliberations would chill the open and frank discussion that is necessary to ensure thorough and independent investigations." *Id.* ¶ 3. Holmes maintains that IPRA has not properly asserted

the privilege. Pl.'s Reply Br. at 2; Pl.'s Sur–Reply Br. at 5. Her main argument is that "IPRA provide[d] the affidavit of an attorney, IPRA's general counsel," as opposed to a "department head." Pl.'s Reply Br. at 2; *see also* Pl.'s Sur–Reply Br. at 5 ("IPRA does nothing to explain why IPRA's Administrator did not invoke the privilege here.").

The Court finds that the O'Shaughnessy declaration substantially complies with the procedural requirements for asserting the deliberative process privilege. It is true that a declaration signed by a government agency's outside *litigation* attorney would not have been enough to establish the privilege. But a declaration signed by the agency's *general counsel* is generally considered sufficient. *Compare Evans*, 231 F.R.D. at 318 (affidavit signed by litigation attorney for the City of the Chicago insufficient to satisfy the City's burden), *with Gov't Suppliers Consolidating Servs., Inc. v. Bayh*, 133 F.R.D. 531, 532–36 (S.D. Ind. 1990) (affidavit submitted by Governor's counsel sufficient to satisfy the government's burden). IPRA's general counsel asserted the privilege based on her familiarity with the agency's investigative procedures and with draft summary reports. O'Shaughnessy Decl. ¶¶ 1–2. Her declaration states that the reports contain "predecisional findings," and that disclosing those reports would stymie IPRA's internal deliberations. *Id.* ¶ 3. To be sure, O'Shaughnessy acknowledges that she has not personally reviewed each draft summary report. *See id.* ¶ 5. But the breadth of the document production (a five-year period) would require a substantial drain on the general counsel's time, and O'Shaughnessy does identify and describe what draft summary reports are as a *category*. In light of the declaration, IPRA has made out a prima facie case that the deliberative process privilege applies to the draft summary reports.

Holmes raises two other arguments against applying the privilege. First, Holmes suggests that the privilege only protects deliberations leading to the setting of overall governmental *policy*. And, according to Holmes, "the notion that IPRA decisions on individual shooting cases reflect the creation of agency *policy* is questionable at best." Pl.'s Sur–Reply Br. at 4 (emphasis added). But this definition the scope of the privilege is much too narrow. The Supreme Court has recognized that the privilege extends to "documents reflecting *advisory opinions, recommendations*[,] *and deliberations* comprising part of a process by which governmental *decisions* and policies are formulated." *Klamath Water Users Protective Assoc.*, 532 U.S. at 9, 121 S.Ct. 1060 (emphases added); *see also Sears, Roebuck & Co.*, 421 U.S. at 150, 95 S.Ct. 1504. There is no requirement that those "governmental decisions" reflect *broad-based* policymaking. Indeed, courts routinely find that the privilege applies to *individualized* governmental decisions. *See, e.g., Farley*, 11 F.3d at 1389 (finding that privilege applied to FTC documents that "were clearly part of the deliberative process leading to the [Department's] decision" "to bring an action against Farley"); *Guzman v. City of Chi.*, 2011 WL 55979, at *4 (N.D. Ill. Jan. 7, 2011) (holding that privilege applied to draft summary reports generated during IPRA's investigation into police officers' alleged assault on the plaintiff and her family); *E.E.O.C. v. Cont'l Airlines, Inc.*, 395 F.Supp.2d 738, 741 (N.D. Ill. 2005) (determining that privilege applied to an EEOC investigative report that led to the EEOC's decision to pursue an enforcement action against the defendant). Here, the draft summary reports "consist[ ] of findings that are intended to be passed on to IPRA's next level of supervision as part of the process for formulating an of-

ficial position with respect to [officer-involved shooting] incident[s]." *Guzman*, 2011 WL 55979, at *4. Because the deliberative process privilege "covers memoranda and discussions ... leading up to the formulation of an official position," *United States v. Zingsheim*, 384 F.3d 867, 872 (7th Cir. 2004), it is broad enough to cover the draft summary reports.[4]

Second, Holmes contends that IPRA waived its right to assert the privilege by failing to expressly assert the privilege and describe the nature of the draft summary reports in its discovery responses. *See* Pl.'s Reply Br. at 1–2; *see also* Fed. Civ. P. 26(b)(5)(A); Fed. R. Civ. P. 45(e)(2)(A). But Holmes does not specifically identify any discovery response evidencing IPRA's failure to expressly claim the privilege. And to the extent that IPRA has produced other investigative documents in this case, the agency has done so "without waiver of applicable privileges ...." IPRA's Resp. Br. at 1; *cf. Howard v. City of Chi.*, 2006 WL 2331096, at *7 (N.D. Ill. Aug. 10, 2006) (observing that " 'release of documents only waives [the deliberative process privilege] for the document or information specifically released, and not for related material[s]' ") (quoting *In re Sealed Case*, 121 F.3d 729, 741 (D.C. Cir. 1997)). IPRA has not waived its right to assert the deliberative process privilege and in fact has made out a prima facie case that the privilege applies.

### B. Particularized Need

 Because IPRA has made out a prima facie case that the privilege applies, Holmes now has the burden of showing she has a particularized need for the draft summary reports. When undergoing the "particularized need" analysis, "the court balances the plaintiff's need for disclosure against the government's need for secrecy ...." *Ferrell*, 177 F.R.D. at 429; *accord Farley*, 11 F.3d at 1390. Courts consider the following factors when conducting that balancing test:

> (1) the relevance of the documents to the litigation; (2) the availability of other evidence that would serve the same purpose as the documents sought; (3) the government's role in the litigation; (4) the seriousness of the litigation and the issues involved in it; and (5) the degree to which disclosure of the documents sought would tend to chill future deliberations within government agencies, that is would hinder frank and independent discussion about government policies and decisions.

*Ferrell*, 177 F.R.D. at 429 (quoting *Edgar*, 964 F.Supp. at 1209).

#### 1. Relevance of the Draft Summary Reports

Holmes alleges that IPRA engaged in a widespread practice of "refusing to find complaints with merit justified or recommend discipline even where the officer has engaged in excessive force ...." Third Am. Compl. ¶ 47; *see also* Pl.'s Mot. to Compel at 2. According to Holmes, the purpose of this practice is "to exonerate officers involved in shootings[.]" Third Am. Compl. ¶ 47. With that theory of *Monell* liability in mind, Holmes offers three theories on why the draft summary reports are relevant: first, she contends that the reports "would likely provide evidence that IPRA administrators ordered changes in findings on wrongful shooting cases ... which in turn proves that IPRA followed [a] code of silence." Pl.'s Mot. to Compel at

---

4. Holmes also maintains that the draft summary reports do not qualify for the privilege because the draft summary reports only contain "purely factual material," which the privilege does not protect. Pl.'s Reply Br. at 3.

But the draft summary reports contain more than just facts; they contain the back-and-forth communications between supervisors and investigators, which is the precise reason why Holmes wants to review them.

3; Pl.'s Reply Br. at 3 (stating that "Plaintiff will discover that IPRA supervisors have been ordering their investigators to change the recommendations of their investigators through the draft summary reports."); Pl.'s Sur–Reply Br. at 1 ("Plaintiff needs the draft summary reports to show that IPRA has an unwritten official practice of covering up … unlawful police shootings by squashing adverse investigative opinions."). Second, she contends that the reports will show that "IPRA has removed unfavorable evidence from shooting files after receipt." Pl.'s Reply Br. at 3 ("The draft summary reports would expose this fraud on the facts since draft summary reports would likely include reference to the now missing evidence."); Pl.'s Sur–Reply Br. at 2 ("Or, has been inferred before, IPRA may simply remove evidence from their files …."). And finally, she contends that the reports may show " 'whether and to what extent IPRA investigators suppressed unfavorable evidence[.]' " Pl.'s Sur–Reply Br. at 2.

Holmes's first relevancy theory makes sense, but the other two—namely, that IPRA removed evidence from investigative files or IPRA investigators have suppressed unfavorable evidence—do not. Remember that this discovery dispute is over the draft summary reports, not the other parts of the investigative file, which will be produced. There is no reason to think that an investigator writing a draft summary report would have referred to evidence that he or she removed from investigative files or would have referred to favorable evidence that is being suppressed. Nor does Holmes offer any example of this happening.

In contrast, the first relevancy theory—that the draft summary reports may show that supervisors ordered investigators to change their recommendations or to otherwise edit the summary reports to be more officer-friendly—does support disclosing the drafts. What is crucial here is that a former IPRA investigator, Lorenzo Davis, has come forward to assert that IPRA fired him for refusing to change his recommendations. See Pl.'s Mot. to Compel at 2 (citing *Davis v. City of Chi.*, Civ. No. 1:15–cv–07771 (N.D. Ill.)); Pl.'s Sur–Reply Br. at 1–2 ("IPRA allegedly terminated Investigator Davis for refusing to comply with the Administrator's demands to change several adverse investigative opinions …."). That assertion, made in a federal-case complaint, shows that there is more to this relevancy theory than mere speculation. When combined Investigator Davis's accusation is combined with Holmes's overall *Monell* theory, that is, that IPRA allegedly investigated police shootings so inadequately that Chicago was a moving force behind Hernandez's shooting of Johnson, the relevance of the draft summary reports weighs in favor of disclosure.

### 2. Availability of Other Evidence

The parties dispute the extent to which other evidence serves the same purpose as the draft summary reports. The Court finds that the draft summary reports serve a unique evidentiary purpose that neither formal non-concurrence memoranda nor the investigative files can serve. Most importantly, draft summary reports would bring to light instances where a supervisor directed an investigator to change the recommendation on a shooting from "unjustified" to "justified," and the investigator capitulated without writing a formal non-concurrence memo. In light of Investigator Davis's allegation, it is reasonable to believe that an investigator, ordered to change his or her recommendation, might very well refrain from writing a non-concurrence memo due to intimidation or for fear of losing his or her job. What's more, draft summary reports would also disclose instances where a supervisor ordered an investigator to edit a summary report so

that the justification for the shooting was artificially stronger in the final summary report that it otherwise ought to be. To be sure, all of this is a long way from proving a custom or practice widespread enough to establish *Monell* liability in front of a jury, but this is the discovery stage, not trial (or even summary judgment).

Although IPRA argues that other evidence is available to try proving *Monell* liability, the other evidence is not a sufficient alternative. IPRA relies on the disclosure of formal non-concurrence memos, but as already discussed earlier, those memos are not enough because they do not cover the instances in which an investigator changed or altered a draft summary report and yet refrained from writing a formal memo out of intimidation or a concern for losing his or her job. The same goes for those parts of the "hundreds of investigation files" IPRA has already produced; they too will not show instances where a supervisor ordered an investigator to change his or her recommendation. IPRA points out that "[i]f [Holmes] believes the final recommendation is not supported by the underlying investigation in any of th[ose] files, she will have the investigation itself to allow her to make that argument." IPRA Resp. Br. at 5. But comparing the final recommendation to the facts of the shooting is not the point of seeking the draft summary reports; the point is to discovery instances where IPRA supervisors persuaded investigators to change their minds before issuing the final summary report.

IPRA also says that it has produced 18 draft summary reports, contending (at one point) that it has "produce[d] *any* draft summary report that is the only evidence of a non-concurrence in a closed investigation." IPRA Resp. Br. at 5 (emphasis added); *see also* IPRA Supp. Resp. Br. at 2 ("IPRA has provided draft reports where those drafts are the only documentation showing a non-concurrence occurred . . . ."). IPRA recently clarified, however, that those 18 reports do not represent *all* draft summary reports that are the only evidence of a non-concurrence: "The production of these [18] drafts . . . was not the result of a comprehensive search by IPRA or IPRA's previous counsel." IPRA Second Supp. Resp. Br. at 3. Instead, those 18 drafts were collected in response to a FOIA request, and the method of collection was this: "IPRA sent an email to all of its personnel asking if any personnel knew of or possessed any draft summary reports indicating a non-concurrence in an investigation. IPRA's leadership received these 18 draft summary reports in response." *Id.* So IPRA did not in fact undergo a review of the investigative files in order to ensure that it produced *all* draft summary reports that are the only evidence of a non-concurrence in a closed investigation.

Lastly, IPRA says that it will make investigators available to testify at a deposition, but that too is not a suitable substitute for the draft summary reports. As the Court discussed during prior hearings on this motion, relying on just the memory and candor of IPRA investigators is not the same as being armed with the draft summary reports. Just as the Court would not expect the defense to simply accept the memory or the word of a plaintiff or a plaintiff's witness, the Court will not expect Holmes to be that obliging under these circumstances. In any event, to the extent that the deliberative process applies to the draft summary reports, it also applies to IPRA investigators' testimony. This means that the Court would have to conduct the same privilege analysis on that testimony as it has had to do with respect to the draft summary reports. The absence of adequate evidentiary substitutes for the draft summary reports weighs in favor of finding a particularized need.

### 3. IPRA's Role in the Litigation

■ IPRA's role in the litigation also shows that Holmes has "a weighty need" for the reports. *Ferrell*, 177 F.R.D. at 429. Where the government agency asserting the privilege is a party to the lawsuit, or its conduct bears on the plaintiff's claim, this factor weighs in favor of finding a particularized need. *See Evans*, 231 F.R.D. at 317 (determining that the role of the Governor's office in the case weighed against findings a particularized need because "[t]he ... office is not a party to this lawsuit, and its conduct does not bear on the question of whether the police officer defendants knowingly sought to procure the prosecution and conviction of an individual whom they knew to be innocent"). IPRA is *not* an independent municipality; it is an agency of the City. And IPRA is, for now, in charge of conducting independent investigations of police misconduct. Holmes directly challenges IPRA's decision-making process as a basis for *Monell* liability. *See* Third Am. Compl. ¶ 47. IRPA's role on the *Monell* claim is thus central, so this factor also supports finding a particularized need.

### 4. Seriousness of the Litigation and Issues

Holmes maintains that the gravity of her allegations—namely, that IPRA "conceal[ed] its widespread efforts to cover-up unlawful shootings by police officers," Pl.'s Reply Br. at 3—warrants disclosing the draft summary reports. In other words, Holmes asserts that the privilege is overcome because IPRA's deliberative process, which includes the back-and-forth exchange of draft summary reports between supervisors and investigators, is "part of the code of silence." *Id.*

Where a plaintiff directly challenges a government agency's deliberative process, courts routinely find that there is a particularized need for disclosure. *See, e.g.,* *Smentek v. Sheriff of Cook Cnty.*, 2013 WL 2588709, at *4 (N.D. Ill. June 11, 2013) (holding that plaintiffs had a particularized need for Cook County Jail pre-budget documents after observing that "the plaintiffs' theory is that the County allegedly approved the dental services budget despite knowing that it might create unconstitutional conditions at the Jail. Accordingly ... the County's deliberative process is directly at issue in this case."); *Ferrell*, 177 F.R.D. at 430-31 (finding a particularized need in a case challenging the Department of Housing and Urban Development's compliance with a consent decree after observing that "[HUD's] decision-making process in this matter—and the corresponding 'roads not taken'—is 'the case' and is directly relevant and crucial to Plaintiffs' contempt motion."); *see also Enviro Tech Int'l, Inc.*, 371 F.3d at 376 (observing that "internal discussions about a course of agency action that would be nefarious, if not illegal, likewise would not be protected by the deliberative process privilege."). As opposed to "the usual 'deliberative process' case in which ... the government tries to prevent its decision-making process from being swept up unnecessarily into [the] public," in these cases "the decisionmaking process ... *is* the case. The issue ... *is* the deliberative process ...." *Bd. of Educ. of City of Chi.*, 610 F.Supp. at 700 (emphases in original). Courts have even applied this reasoning to compel disclosure in cases (like this one) that challenge a law enforcement practice under *Monell*. *See, e.g., Nehad v. Browder*, 2016 WL 2745411, at *6-7 (S.D. Cal. May 10, 2016) (overruling police department's assertion of privilege over internal affairs investigation documents where plaintiff alleged that the department's investigation procedures were unconstitutional under *Monell*), *reconsideration denied*, 2016 WL 3769807 (S.D. Cal. July 15, 2016); *Reid v. Cumberland Cnty.*, 34 F.Supp.3d 396, 411

(D.N.J. 2013) (observing that "were the deliberative process to be applicable, Plaintiff's need for the evidence would overcome the CCDOC's assertion of the privilege," given that "the policymakers' knowledge of and reaction to similar incidents of excessive force are relevant to the Plaintiff's allegations of a policy or custom of permitting excessive force ...."); *cf. Anilao v. Spota*, 2015 WL 5793667, at *20 (E.D.N.Y. Sept. 30, 2015) (rejecting district attorney's assertion of the privilege during a deposition after reasoning that "these questions go to the essence of the claims raised in this case, namely, the decision making process involved in the determination to prosecute the Plaintiffs.").

As in these cases, the nature of the *Monell* claim here weighs in favor of ordering IPRA to produce the draft summary reports. This is because IPRA's decision-making process, including its alleged "refus[al] to find complaints with merit justified or recommend discipline even where the officer has engaged in excessive force," Third Am. Compl. ¶ 47; Pl.'s Sur–Reply Br. at 1 ("IPRA has a widespread practice of whitewashing dissent and aiding cover-ups of police misconduct."), *is* the case, at least as to the *Monell* claim. *See Bd. of Educ. of City of Chi.*, 610 F.Supp. at 700. And, as the Court has already pointed out, *see supra* Section III. B.1–2., the draft summary reports are the only documentary evidence of that process. Because *Monell* liability in this case might very well turn on the back-and-forth ex-

change between IPRA supervisors and investigators, this factor too weighs in favor of finding that Holmes's need for those reports overcomes IPRA's assertion of the privilege.[5]

### 5. The Chill on Deliberations

The final factor in the particularized need analysis is the degree to which disclosure would chill deliberations. IPRA maintains that disclosing the draft summary reports would have a chilling effect: "If these drafts are produced, persons preparing them will be chilled in their full and frank recommendations, proposals, and suggestions." IPRA's Supp. Resp. Br. at 5. Likewise, the O'Shaughnessy Declaration states that "[i]nvestigators and supervisors may be less likely to express their opinions if they knew that those pre-decisional discussions could be made a part of the public record, thereby inhibiting the free flow of ideas necessary to conduct thorough and independent investigations." O'Shaughnessy Decl. ¶ 3. Holmes argues that "[t]he risk of [chilling deliberations in future investigations] is remote and even imaginary and cannot be squared with the reality that the opinions of IPRA and their investigations are frequently scrutinized in the public forum." Pl.'s Sur–Reply Br. at 4.

The Court does agree that there is some danger that compelling disclosure of the draft summary reports could impede the candor of IPRA pre-decisional discussions in the future. *See Guzman*, 2011 WL 55979, at *4 (positing that "requiring the

---

5. To support its assertion of the privilege, IPRA relies on another decision in this District, *Guzman v. City of Chicago*, 2011 WL 55979 (N.D. Ill. Jan. 7, 2011). In that case, the court held that the deliberative process privilege applied to IPRA draft summary reports. *Id.* at *4. In that case, however, the plaintiff did not appear to present record evidence of the seriousness of that claim, nor evidence that a former investigator alleged retaliation for refusing to change a recom-

mendation. *Cf. id.* (considering "(1) the relevance of the documents to the litigation, (2) the availability of other evidence ..., and (3) the degree to which disclosure ... would hinder frank and independent discussion about governmental policies and decisions" when determining whether the plaintiff had demonstrated a particularized need for the draft summary reports (quotation marks and citation omitted)).

production of communications among IPRA investigators and their supervisors constitutes an intrusion that would seriously hinder the frank discussion that governmental decisions deserve"). That IPRA investigative files are often sought in excessive force cases only increases the risk that disclosure could chill future deliberations. *Cf. Evans*, 231 F.R.D. at 317 (holding that disclosing pre-pardon discussions would not hinder future pardon decisions because "[m]ost pardon decisions are never the subject of, or relevant to, any litigation").

But the extent of the impact on IPRA deliberations is dampened because IPRA already purportedly generates a record of internal dissent: the formal non-concurrence memoranda. In light of the fact that investigators and supervisors know that non-concurrences are formally memorialized, these same investigators and supervisors should not feel much more inhibited in having frank deliberations due to the potential of disclosure of draft summary reports. To be sure, disclosing the draft summary reports probably does have some marginal impact on deliberations above and beyond the formal non-concurrence memoranda, but till the point remains: disagreement during deliberations is already subject to a certain form of disclosure. What's more, at least for the time being, the draft summary reports can be produced as "attorneys' eyes only." Unless and until Holmes can show that the reports should be admissible at trial, or shown to certain witnesses during discovery (such as depositions), the drafts would remain tightly held. That assurance—that draft summary reports would not be casually blasted out to the public at large—should give an additional measure of protection to investigators and supervisors when they consider how fulsome their deliberations should be when recording them in draft summary reports.

## IV. Conclusion

On balance, the relevancy of the draft summary reports and IPRA's role in this case, coupled with the seriousness of this litigation and the fact that Holmes cannot reasonably obtain this information via other evidence outweigh IPRA's claim that disclosure would chill future deliberations. So IPRA's objection to disclosing the draft summary reports based on the deliberative process privilege is overruled. But, as mentioned earlier, IPRA also objects to producing the draft summary reports on the grounds that doing so would be unduly burdensome.[6] The parties and the Court are still working through the burden issue, which will be the subject of additional discussion at the status hearing of November 22, 2016.

---

**6.** The Federal Rules of Civil Procedure repeatedly underscore the importance of protecting both parties and non-parties from undue burden. *See, e.g.,* Fed. R. Civ. P. 26(c)(1) (stating that "[t]he court may, for good cause, issue an order to protect a party or person from … undue burden or expense"); Fed. R. Civ. P. 26(g)(1)(B)(iii) (requiring an attorney signing off on a discovery request to certify that the request is "neither unreasonable nor unduly burdensome or expensive"); Fed. R. Civ. P. 45(d)(3)(A)(iv) (mandating that a court "quash or modify" a subpoena that "subjects a person to undue burden").